# McKEIVER ET AL. *v.* PENNSYLVANIA

No. 322.   Argued December 10, 1970—Decided June 21, 1971*

---

*Together with No. 128, *In re Burrus et al.*, on certiorari to the Supreme Court of North Carolina, argued December 9–10, 1970.

BLACKMUN, J., announced the Court's judgments and delivered an opinion in which BURGER, C. J., and STEWART and WHITE, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 551. BRENNAN, J., filed an opinion concurring in the judgment in No. 322 and dissenting in No. 128, *post*, p. 553. HARLAN, J., filed an opinion concurring in the judgments, *post*, p. 557. DOUGLAS, J., filed a dissenting opinion, in which BLACK and MARSHALL, JJ., joined, *post*, p. 557.

*Daniel E. Farmer* argued the cause for appellants in No. 322. With him on the brief were *John S. Roberts,*

*Jr., Peter W. Brown, Harvey N Schmidt,* and *James O. Freedman.*

*Michael Meltsner* argued the cause for petitioners in No. 128. With him on the briefs were *Jack Greenberg, Julius L. Chambers, James E. Ferguson II,* and *Anthony Amsterdam.*

*Arlen Specter* argued the cause for appellee in No. 322. With him on the brief was *James D. Crawford.*

*Robert Morgan,* Attorney General, argued the cause for respondent, the State of North Carolina, in No. 128. With him on the brief were *Ralph Moody,* Deputy Attorney General, and *Andrew A. Vanore, Jr.,* Assistant Attorney General.

*Alfred L. Scanlan* argued the cause for the National Council of Juvenile Court Judges as *amicus curiae* urging affirmance in No. 128. With him on the brief was *Martin J. Flynn.*

Briefs of *amici curiae* in No. 128 were filed by *John J. Droney* for the Commonwealth of Massachusetts; by *Thomas C. Lynch,* Attorney General, *Albert W. Harris, Jr.,* Assistant Attorney General, and *Derald E. Granberg* and *Gloria F. DeHart,* Deputy Attorneys General, for the State of California; and by *Norman Lefstein* for the Public Defender Service for the District of Columbia et al.

Mr. Justice Blackmun announced the judgments of the Court and an opinion in which The Chief Justice, Mr. Justice Stewart, and Mr. Justice White join.

These cases present the narrow but precise issue whether the Due Process Clause of the Fourteenth Amendment assures the right to trial by jury in the adjudicative phase of a state juvenile court delinquency proceeding.

## 1

The issue arises understandably, for the Court in a series of cases already has emphasized due process factors protective of the juvenile:

1. *Haley* v. *Ohio*, 332 U. S. 596 (1948), concerned the admissibility of a confession taken from a 15-year-old boy on trial for first-degree murder. It was held that, upon the facts there developed, the Due Process Clause barred the use of the confession. MR. JUSTICE DOUGLAS, in an opinion in which three other Justices joined, said, "Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law." 332 U. S., at 601.

2. *Gallegos* v. *Colorado*, 370 U. S. 49 (1962), where a 14-year-old was on trial, is to the same effect.

3. *Kent* v. *United States*, 383 U. S. 541 (1966), concerned a 16-year-old charged with housebreaking, robbery, and rape in the District of Columbia. The issue was the propriety of the juvenile court's waiver of jurisdiction "after full investigation," as permitted by the applicable statute. It was emphasized that the latitude the court possessed within which to determine whether it should retain or waive jurisdiction "assumes procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement of a 'full investigation.'" 383 U. S., at 553.

4. *In re Gault*, 387 U. S. 1 (1967), concerned a 15-year-old, already on probation, committed in Arizona as a delinquent after being apprehended upon a complaint of lewd remarks by telephone. Mr. Justice Fortas, in writing for the Court, reviewed the cases just cited and observed,

> "Accordingly, while these cases relate only to restricted aspects of the subject, they unmistakably

indicate that, whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." 387 U. S., at 13.

The Court focused on "the proceedings by which a determination is made as to whether a juve..ile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution" and, as to this, said that "there appears to be little current dissent from the proposition that the Due Process Clause has a role to play." *Ibid. Kent* was adhered to: "We reiterate this view, here in connection with a juvenile court adjudication of 'delinquency,' as a requirement which is part of the Due Process Clause of the Fourteenth Amendment of our Constitution." *Id.,* at 30–31. Due process, in that proceeding, was held to embrace adequate written notice; advice as to the right to counsel, retained or appointed; confrontation; and cross-examination. The privilege against self-incrimination was also held available to the juvenile. The Court refrained from deciding whether a State must provide appellate review in juvenile cases or a transcript or recording of the hearings.

5. *DeBacker* v. *Brainard,* 396 U. S. 28 (1969), presented, by state habeas corpus, a challenge to a Nebraska statute providing that juvenile court hearings "shall be conducted by the judge without a jury in an informal manner." However, because that appellant's hearing had antedated the decisions in *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and *Bloom* v. *Illinois,* 391 U. S. 194 (1968), and because *Duncan* and *Bloom* had been given only prospective application by *DeStefano* v. *Woods,* 392 U. S. 631 (1968), DeBacker's case was deemed an inappropriate one for resolution of the jury trial issue. His appeal was therefore dismissed. MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS, in separate dissents, took the position that a juvenile is entitled to a jury trial at

the adjudicative stage. MR. JUSTICE BLACK described this as "a right which is surely one of the fundamental aspects of criminal justice in the English-speaking world," 396 U. S., at 34, and MR. JUSTICE DOUGLAS described it as a right required by the Sixth and Fourteenth Amendments "where the delinquency charged is an offense that, if the person were an adult, would be a crime triable by jury." 396 U. S., at 35.

6. *In re Winship,* 397 U. S. 358 (1970), concerned a 12-year-old charged with delinquency for having taken money from a woman's purse. The Court held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," 397 U. S., at 364, and then went on to hold, at 368, that this standard was applicable, too, "during the adjudicatory stage of a delinquency proceeding."

From these six cases—*Haley, Gallegos, Kent, Gault, DeBacker,* and *Winship*—it is apparent that:

1. Some of the constitutional requirements attendant upon the state criminal trial have equal application to that part of the state juvenile proceeding that is adjudicative in nature. Among these are the rights to appropriate notice, to counsel, to confrontation and to cross-examination, and the privilege against self-incrimination. Included, also, is the standard of proof beyond a reasonable doubt.

2. The Court, however, has not yet said that *all* rights constitutionally assured to an adult accused of crime also are to be enforced or made available to the juvenile in his delinquency proceeding. Indeed, the Court specifically has refrained from going that far:

> "We do not mean by this to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual admin-

.istrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment." *Kent*, 383 U. S., at 562; *Gault*, 387 U. S., at 30.

3. The Court, although recognizing the high hopes and aspirations of Judge Julian Mack, the leaders of the Jane Addams School[1] and the other supporters of the juvenile court concept, has also noted the disappointments of the system's performance and experience and the resulting widespread disaffection. *Kent*, 383 U. S., at 555–556; *Gault*, 387 U. S., at 17–19. There have been, at one and the same time, both an appreciation for the juvenile court judge who is devoted, sympathetic, and conscientious, and a disturbed concern about the judge who is untrained and less than fully imbued with an understanding approach to the complex problems of childhood and adolescence. There has been praise for the system and its purposes, and there has been alarm over its defects.

4. The Court has insisted that these successive decisions do not spell the doom of the juvenile court system or even deprive it of its "informality, flexibility, or speed." *Winship*, 397 U. S., at 366. On the other hand, a concern precisely to the opposite effect was expressed by two dissenters in *Winship*. *Id.*, at 375–376.

## II

With this substantial background already developed, we turn to the facts of the present cases:

*No. 322.* Joseph McKeiver, then age 16, in May 1968 was charged with robbery, larceny, and receiving stolen goods (felonies under Pennsylvania law, Pa. Stat. Ann., Tit. 18, §§ 4704, 4807, and 4817 (1963)) as acts of juve-

---

[1] See Mr. Justice Fortas' article, Equal Rights—For Whom?, 42 N. Y. U. L. Rev. 401, 406 (1967).

nile delinquency. At the time of the adjudication hearing he was represented by counsel.[2] His request for a jury trial was denied and his case was heard by Judge Theodore S. Gutowicz of the Court of Common Pleas, Family Division, Juvenile Branch, of Philadelphia County, Pennsylvania. McKeiver was adjudged a delinquent upon findings that he had violated a law of the Commonwealth. Pa. Stat. Ann., Tit. 11, § 243 (4) (a) (1965). He was placed on probation. On appeal, the Superior Court affirmed without opinion. *In re McKeiver,* 215 Pa. Super. 760, 255 A. 2d 921 (1969).

Edward Terry, then age 15, in January 1969 was charged with assault and battery on a police officer and conspiracy (misdemeanors under Pennsylvania law, Pa. Stat. Ann., Tit. 18, §§ 4708 and 4302 (1963)) as acts of juvenile delinquency. His counsel's request for a jury trial was denied and his case was heard by Judge Joseph C. Bruno of the same Juvenile Branch of the Court of Common Pleas of Philadelphia County. Terry was adjudged a delinquent on the charges. This followed an adjudication and commitment in the preceding week for an assault on a teacher. He was committed, as he had been on the earlier charge, to the Youth Development Center at Cornwells Heights. On appeal, the Superior Court affirmed without opinion. *In re Terry,* 215 Pa. Super. 762, 255 A. 2d 922 (1969).

The Supreme Court of Pennsylvania granted leave to appeal in both cases and consolidated them. The single question considered, as phrased by the court, was "whether there is a constitutional right to a jury trial in juvenile court." The answer, one justice dissenting, was

---

[2] At McKeiver's hearing his counsel advised the court that he had never seen McKeiver before and "was just in the middle of interviewing" him. The court allowed him five minutes for the interview. Counsel's office, Community Legal Services, however, had been appointed to represent McKeiver five months earlier. App. 2.

in the negative. *In re Terry*, 438 Pa. 339, 265 A. 2d 350 (1970). We noted probable jurisdiction. 399 U. S. 925 (1970).

The details of the McKeiver and Terry offenses are set forth in Justice Roberts' opinion for the Pennsylvania court, 438 Pa., at 341–342, nn. 1 and 2, 265 A. 2d, at 351 nn. 1 and 2, and need not be repeated at any length here. It suffices to say that McKeiver's offense was his participating with 20 or 30 youths who pursued three young teenagers and took 25 cents from them; that McKeiver never before had been arrested and had a record of gainful employment; that the testimony of two of the victims was described by the court as somewhat inconsistent and as "weak"; and that Terry's offense consisted of hitting a police officer with his fists and with a stick when the officer broke up a boys' fight Terry and others were watching.

*No. 128.* Barbara Burrus and approximately 45 other black children, ranging in age from 11 to 15 years,[3] were the subjects of juvenile court summonses issued in Hyde County, North Carolina, in January 1969.

The charges arose out of a series of demonstrations in the county in late 1968 by black adults and children protesting school assignments and a school consolidation plan. Petitions were filed by North Carolina state highway patrolmen. Except for one relating to James Lambert Howard, the petitions charged the respective juveniles with wilfully impeding traffic. The charge against Howard was that he wilfully made riotous noise and was disorderly in the O. A. Peay School in Swan Quarter; interrupted and disturbed the school during its regular sessions; and defaced school furniture. The acts so

---

[3] In North Carolina juvenile court procedures are provided only for persons under the age of 16. N. C. Gen. Stat. §§ 7A–277 and 7A–278 (1) (1969).

charged are misdemeanors under North Carolina law.
N. C. Gen. Stat. §§ 20–174.1 (1965 and Supp. 1969),
14–132 (a), 14–273 (1969).

The several cases were consolidated into groups for
hearing before District Judge Hallett S. Ward, sitting as
a juvenile court. The same lawyer appeared for all the
juveniles. Over counsel's objection, made in all except
two of the cases, the general public was excluded. A
request for a jury trial in each case was denied.

The evidence as to the juveniles other than Howard
consisted solely of testimony of highway patrolmen. No
juvenile took the stand or offered any witness. The
testimony was to the effect that on various occasions the
juveniles and adults were observed walking along High-
way 64 singing, shouting, clapping, and playing basket-
ball. As a result, there was interference with traffic.
The marchers were asked to leave the paved portion of
the highway and they were warned that they were com-
mitting a statutory offense. They either refused or left
the roadway and immediately returned. The juveniles
and participating adults were taken into custody. Juve-
nile petitions were then filed with respect to those under
the age of 16.

The evidence as to Howard was that on the morning
of December 5, he was in the office of the principal of
the O. A. Peay School with 15 other persons while school
was in session and was moving furniture around; that
the office was in disarray; that as a result the school
closed before noon; and that neither he nor any of the
others was a student at the school or authorized to enter
the principal's office.

In each case the court found that the juvenile had
committed "an act for which an adult may be punished
by law." A custody order was entered declaring the
juvenile a delinquent "in need of more suitable guardian-
ship" and committing him to the custody of the County

Department of Public Welfare for placement in a suitable institution "until such time as the Board of Juvenile Correction or the Superintendent of said institution may determine, not inconsistent with the laws of this State." The court, however, suspended these commitments and placed each juvenile on probation for either one or two years conditioned upon his violating none of the State's laws, upon his reporting monthly to the County Department of Welfare, upon his being home by 11 p. m. each evening, and upon his attending a school approved by the Welfare Director. None of the juveniles has been confined on these charges.

On appeal, the cases were consolidated into two groups. The North Carolina Court of Appeals affirmed. *In re Burrus,* 4 N. C. App. 523, 167 S. E. 2d 454 (1969); *In re Shelton,* 5 N. C. App. 487, 168 S. E. 2d 695 (1969). In its turn the Supreme Court of North Carolina deleted that portion of the order in each case relating to commitment, but otherwise affirmed. *In re Burrus,* 275 N. C. 517, 169 S. E. 2d 879 (1969). Two justices dissented without opinion. We granted certiorari. 397 U. S. 1036 (1970).

### III

It is instructive to review, as an illustration, the substance of Justice Roberts' opinion for the Pennsylvania court. He observes, 438 Pa., at 343, 265 A. 2d, at 352, that "[f]or over sixty-five years the Supreme Court gave no consideration at all to the constitutional problems involved in the juvenile court area"; that *Gault* "is somewhat of a paradox, being both broad and narrow at the same time"; that it "is broad in that it evidences a fundamental and far-reaching disillusionment with the anticipated benefits of the juvenile court system"; that it is narrow because the court enumerated four due process rights which it held applicable in juvenile proceedings, but declined to rule on two other claimed rights, *id.,* at

344–345, 265 A. 2d, at 353; that as a consequence the Pennsylvania court was "confronted with .a sweeping rationale and a carefully tailored holding," *id.*, at 345, 265 A. 2d, at 353; that the procedural safeguards *"Gault* specifically made applicable to juvenile courts have already caused a significant 'constitutional domestication' of juvenile court proceedings," *id.*, at 346, 265 A. 2d, at 354; that those safeguards and other rights, including the reasonable-doubt standard established by *Winship,* "insure that the juvenile court will operate in an atmosphere which is orderly enough to impress the juvenile with the gravity of the situation and the impartiality of the tribunal and at the same time informal enough to permit the benefits of the juvenile system to operate" (footnote omitted), *id.*, at 347, 265 A. 2d, at 354; that the "proper inquiry, then, is whether the right to a trial by jury is 'fundamental' within the meaning of *Duncan,* in the context of a juvenile court which operates with *all* of the above constitutional safeguards," *id.*, at 348, 265 A. 2d, at 354; and that his court's inquiry turned "upon whether there are elements in the juvenile process which render the right to a trial by jury less essential to the protection of an accused's rights in the juvenile system than in the normal criminal process." *Ibid.*

Justice Roberts then concluded that such factors do inhere in the Pennsylvania juvenile system: (1) Although realizing that "faith in the quality of the juvenile bench is not an entirely satisfactory substitute for due process," *id.*, at 348, 265 A. 2d, at 355, the judges in the juvenile courts "do take a different view of their role than that taken by their counterparts in the criminal courts." *Id.*, at 348, 265 A. 2d, at 354–355. (2) While one regrets its inadequacies, "the juvenile system has available and utilizes much more fully various diagnostic and rehabilitative services" that are "far superior to those available in the regular criminal process." *Id.*, at 348–

349, 265 A. 2d, at 355. (3) Although conceding that the post-adjudication process "has in many respects fallen far short of its goals, and its reality is far harsher than its theory," the end result of a declaration of delinquency "*is* significantly different from and less onerous than a finding of criminal guilt" and "we are not yet convinced that the current practices do not contain the seeds from which a truly appropriate system can be brought forth." (4) Finally, "of all the possible due process rights which could be applied in the juvenile courts, the right to trial by jury is the one which would most likely be disruptive of the unique nature of the juvenile process." It is the jury trial that "would probably require substantial alteration of the traditional practices." The other procedural rights held applicable to the juvenile process "will give the juveniles sufficient protection" and the addition of the trial by jury "might well destroy the traditional character of juvenile proceedings." *Id.,* at 349–350, 265 A. 2d, at 355.

The court concluded, *id.,* at 350, 265 A. 2d, at 356, that it was confident "that a properly structured and fairly administered juvenile court system can serve our present societal needs without infringing on individual freedoms."

IV

The right to an impartial jury "[i]n all criminal prosecutions" under federal law is guaranteed by the Sixth Amendment. Through the Fourteenth Amendment that requirement has now been imposed upon the States "in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." This is because the Court has said it believes "that trial by jury in criminal cases is fundamental to the American scheme of justice." *Duncan* v. *Louisiana,* 391 U. S. 145, 149 (1968); *Bloom* v. *Illinois,* 391 U. S. 194, 210–211 (1968).

This, of course, does not automatically provide the answer to the present jury trial issue, if for no other reason than that the juvenile court proceeding has not yet been held to be a "criminal prosecution," within the meaning and reach of the Sixth Amendment, and also has not yet been regarded as devoid of criminal aspects merely because it usually has been given the civil label. *Kent*, 383 U. S., at 554; *Gault*, 387 U. S., at 17, 49–50; *Winship*, 397 U. S., at 365–366.

Little, indeed, is to be gained by any attempt simplistically to call the juvenile court proceeding either "civil" or "criminal." The Court carefully has avoided this wooden approach. Before *Gault* was decided in 1967, the Fifth Amendment's guarantee against self-incrimination had been imposed upon the state criminal trial. *Malloy* v. *Hogan*, 378 U. S. 1 (1964). So, too, had the Sixth Amendment's rights of confrontation and cross-examination. *Pointer* v. *Texas*, 380 U. S. 400 (1965), and *Douglas* v. *Alabama*, 380 U. S. 415 (1965). Yet the Court did not automatically and peremptorily apply those rights to the juvenile proceeding. A reading of *Gault* reveals the opposite. And the same separate approach to the standard-of-proof issue is evident from the carefully separated application of the standard, first to the criminal trial, and then to the juvenile proceeding, displayed in *Winship*. 397 U. S., at 361 and 365.

Thus, accepting "the proposition that the Due Process Clause has a role to play," *Gault*, 387 U. S., at 13, our task here with respect to trial by jury, as it was in *Gault* with respect to other claimed rights, "is to ascertain the precise impact of the due process requirement." *Id.*, at 13–14.

V

The Pennsylvania juveniles' basic argument is that they were tried in proceedings "substantially similar to a criminal trial." They say that a delinquency proceed-

ing in their State is initiated by a petition charging a
penal code violation in the conclusory language of an
indictment; that a juvenile detained prior to trial is held
in a building substantially similar to an adult prison;
that in Philadelphia juveniles over 16 are, in fact, held
in the cells of a prison; that counsel and the prosecution
engage in plea bargaining; that motions to suppress are
routinely heard and decided; that the usual rules of evi-
dence are applied; that the customary common-law
defenses are available; that the press is generally admit-
ted in the Philadelphia juvenile courtrooms; that mem-
bers of the public enter the room; that arrest and prior
record may be reported by the press (from police sources,
however, rather than from the juvenile court records);
that, once adjudged delinquent, a juvenile may be con-
fined until his majority in what amounts to a prison
(see *In re Bethea,* 215 Pa. Super. 75, 76, 257 A. 2d 368,
369 (1969), describing the state correctional institution
at Camp Hill as a "maximum security prison for ad-
judged delinquents and youthful criminal offenders");
and that the stigma attached upon delinquency adjudi-
cation approximates that resulting from conviction in an
adult criminal proceeding.

The North Carolina juveniles particularly urge that
the requirement of a jury trial would not operate to deny
the supposed benefits of the juvenile court system; that
the system's primary benefits are its discretionary intake
procedure permitting disposition short of adjudication,
and its flexible sentencing permitting emphasis on re-
habilitation; that realization of these benefits does not
depend upon dispensing with the jury; that adjudication
of factual issues on the one hand and disposition of the
case on the other are very different matters with very
different purposes; that the purpose of the former is
indistinguishable from that of the criminal trial; that the
jury trial provides an independent protective factor; that

experience has shown that jury trials in juvenile courts are manageable; that no reason exists why protection traditionally accorded in criminal proceedings should be denied young people subject to involuntary incarceration for lengthy periods; and that the juvenile courts deserve healthy public scrutiny.

## VI

All the litigants here agree that the applicable due process standard in juvenile proceedings, as developed by *Gault* and *Winship,* is fundamental fairness. As that standard was applied in those two cases, we have an emphasis on factfinding procedures. The requirements of notice, counsel, confrontation, cross-examination, and standard of proof naturally flowed from this emphasis. But one cannot say that in our legal system the jury is a necessary component of accurate factfinding. There is much to be said for it, to be sure, but we have been content to pursue other ways for determining facts. Juries are not required, and have not been, for example, in equity cases, in workmen's compensation, in probate, or in deportation cases. Neither have they been generally used in military trials. In *Duncan* the Court stated, "We would not assert, however, that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury." 391 U. S., at 158. In *DeStefano,* for this reason and others, the Court refrained from retrospective application of *Duncan,* an action it surely would have not taken had it felt that the integrity of the result was seriously at issue. And in *Williams* v. *Florida,* 399 U. S. 78 (1970), the Court saw no particular magic in a 12-man jury for a criminal case, thus revealing that even jury concepts themselves are not inflexible.

We must recognize, as the Court has recognized before, that the fond and idealistic hopes of the juvenile court

proponents and early reformers of three generations ago have not been realized. The devastating commentary upon the system's failures as a whole, contained in the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime 7–9 (1967), reveals the depth of disappointment in what has been accomplished. Too often the juvenile court judge falls far short of that stalwart, protective, and communicating figure the system envisaged.[4] The community's unwillingness to provide people and facilities and to be concerned, the insufficiency of time devoted, the scarcity of professional help, the inadequacy of dispositional alternatives, and our general lack of knowledge all contribute to dissatisfaction with the experiment.[5]

---

[4] "A recent study of juvenile court judges . . . revealed that half had not received undergraduate degrees; a fifth had received no college education at all; a fifth were not members of the bar." Task Force Report 7.

[5] "What emerges, then, is this: In theory the juvenile court was to be helpful and rehabilitative rather than punitive. In fact the distinction often disappears, not only because of the absence of facilities and personnel but also because of the limits of knowledge and technique. In theory the court's action was to affix no stigmatizing label. In fact a delinquent is generally viewed by employers, schools, the armed services—by society generally—as a criminal. In theory the court was to treat children guilty of criminal acts in noncriminal ways. In fact it labels truants and runaways as junior criminals.

"In theory the court's operations could justifiably be informal, its findings and decisions made without observing ordinary procedural safeguards, because it would act only in the best interest of the child. In fact it frequently does nothing more nor less than deprive a child of liberty without due process of law—knowing not what else to do and needing, whether admittedly or not, to act in the community's interest even more imperatively than the child's. In theory it was to exercise its protective powers to bring an errant child back into the fold. In fact there is increasing reason to believe that its intervention reinforces the juvenile's unlawful impulses. In theory it

The Task Force Report, however, also said, *id.*, at 7, "To say that juvenile courts have failed to achieve their goals is to say no more than what is true of criminal courts in the United States. But failure is most striking when hopes are highest."

Despite all these disappointments, all these failures, and all these shortcomings, we conclude that trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement. We so conclude for a number of reasons:

1. The Court has refrained, in the cases heretofore decided, from taking the easy way with a flat holding that all rights constitutionally assured for the adult accused are to be imposed upon the state juvenile proceeding. What was done in *Gault* and in *Winship* is aptly described in *Commonwealth* v. *Johnson*, 211 Pa. Super. 62, 74, 234 A. 2d 9, 15 (1967):

> "It is clear to us that the Supreme Court has properly attempted to strike a judicious balance by injecting procedural orderliness into the juvenile court system. It is seeking to reverse the trend [pointed out in *Kent*, 383 U.S., at 556] whereby 'the child receives the worst of both worlds . . . .' "

2. There is a possibility, at least, that the jury trial, if required as a matter of constitutional precept, will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding.

3. The Task Force Report, although concededly pre-*Gault*, is notable for its not making any recommendation

was to concentrate on each case the best of current social science learning. In fact it has often become a vested interest in its turn, loathe to cooperate with innovative programs or avail itself of forward-looking methods." Task Force Report 9.

that the jury trial be imposed upon the juvenile court system. This is so despite its vivid description of the system's deficiencies and disappointments. Had the Commission deemed this vital to the integrity of the juvenile process, or to the handling of juveniles, surely a recommendation or suggestion to this effect would have appeared. The intimations, instead, are quite the other way. Task Force Report 38. Further, it expressly recommends against abandonment of the system and against the return of the juvenile to the criminal courts.[6]

---

[6] "Nevertheless, study of the juvenile courts does not necessarily lead to the conclusion that the time has come to jettison the experiment and remand the disposition of children charged with crime to the criminal courts of the country. As trying as are the problems of the juvenile courts, the problems of the criminal courts, particularly those of the lower courts, which would fall heir to much of the juvenile court jurisdiction, are even graver; and the ideal of separate treatment of children is still worth pursuing. What is required is rather a revised philosophy of the juvenile court based on the recognition that in the past our reach exceeded our grasp. The spirit that animated the juvenile court movement was fed in part by a humanitarian compassion for offenders who were children. That willingness to understand and treat people who threaten public safety and security should be nurtured, not turned aside as hopeless sentimentality, both because it is civilized and because social protection itself demands constant search for alternatives to the crude and limited expedient of condemnation and punishment. But neither should it be allowed to outrun reality. The juvenile court is a court of law, charged like other agencies of criminal justice with protecting the community against threatening conduct. Rehabilitating offenders through individualized handling is one way of providing protection, and appropriately the primary way in dealing with children. But the guiding consideration for a court of law that deals with threatening conduct is nonetheless protection of the community. The juvenile court, like other courts, is therefore obliged to employ all the means at hand, not excluding incapacitation, for achieving that protection. What should distinguish the juvenile from the criminal courts is greater emphasis on rehabilitation, not exclusive preoccupation with it." Task Force Report 9.

4. The Court specifically has recognized by dictum that a jury is not a necessary part even of every criminal process that is fair and equitable. *Duncan* v. *Louisiana*, 391 U. S., at 149–150, n. 14, and 158.

5. The imposition of the jury trial on the juvenile court system would not strengthen greatly, if at all, the factfinding function, and would, contrarily, provide an attrition of the juvenile court's assumed ability to function in a unique manner. It would not remedy the defects of the system. Meager as has been the hoped-for advance in the juvenile field, the alternative would be regressive, would lose what has been gained, and would tend once again to place the juvenile squarely in the routine of the criminal process.

6. The juvenile concept held high promise. We are reluctant to say that, despite disappointments of grave dimensions, it still does not hold promise, and we are particularly reluctant to say, as do the Pennsylvania appellants here, that the system cannot accomplish its rehabilitative goals. So much depends on the availability of resources, on the interest and commitment of the public, on willingness to learn, and on understanding as to cause and effect and cure. In this field, as in so many others, one perhaps learns best by doing. We are reluctant to disallow the States to experiment further and to seek in new and different ways the elusive answers to the problems of the young, and we feel that we would be impeding that experimentation by imposing the jury trial. The States, indeed, must go forward. If, in its wisdom, any State feels the jury trial is desirable in all cases, or in certain kinds, there appears to be no impediment to its installing a system embracing that feature. That, however, is the State's privilege and not its obligation.

7. Of course there have been abuses. The Task Force Report has noted them. We refrain from saying at this

point that those abuses are of constitutional dimension. They relate to the lack of resources and of dedication rather than to inherent unfairness.

8. There is, of course, nothing to prevent a juvenile court judge, in a particular case where he feels the need, or when the need is demonstrated, from using an advisory jury.

9. "The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' *Snyder* v. *Massachusetts,* 291 U. S. 97, 105 (1934)." *Leland* v. *Oregon,* 343 U. S. 790, 798 (1952). It therefore is of more than passing interest that at least 29 States and the District of Columbia by statute deny the juvenile a right to a jury trial in cases such as these.[7] The same result is achieved in other

---

[7] Ala. Code, Tit. 13, § 369 (1958); Alaska Stat. § 47.10.070 (Supp. 1970); Ariz. Rev. Stat. Ann. § 8–229 (1956), see Ariz. Laws, c. 223 (May 19, 1970); Ark. Stat. Ann. § 45–206 (1964); Del. Code Ann., Tit. 10, § 1175 (Supp. 1970); Fla. Stat. § 39.09 (2) (1965); Ga. Code Ann. § 24–2420 (Supp. 1970); Hawaii Rev. Stat. § 571–41 (1968); Idaho Code § 16–1813 (Supp. 1969); Ind. Ann. Stat. § 9–3215 (Supp. 1970); Iowa Code § 232.27 (1971); Ky. Rev. Stat. § 208.060 (1962); La. Rev. Stat. § 13:1579 (Supp. 1962); Minn. Stat. § 260.155 subd. 1 (1969); Miss. Code Ann. § 7185–08 (1942); Mo. Rev. Stat. § 211.171 (6) (1969) (equity practice controls); Neb. Rev. Stat. § 43–206.03 (2) (1968); Nev. Rev. Stat. § 62.190 (3) (1968); N. J. Stat. Ann. § 2A:4–35 (1952); N. Y. Family Court Act §§ 164 and 165 and Civ. Prac. Law and Rules § 4101; N. C. Gen. Stat. § 7A–285 (1969); N. D. Cent. Code § 27–16–18 (1960); Ohio Rev. Code Ann. § 2151.35 (Supp. 1970); Ore. Rev. Stat. § 419.498 (1) (1968); Pa. Stat. Ann., Tit. 11, § 247 (1965); S. C. Code Ann. § 15–1095.19 (Supp. 1970); Utah Code Ann. § 55–10–94 (Supp. 1969); Vt. Stat. Ann., Tit. 33, § 651 (a) (Supp. 1970); Wash. Rev. Code Ann. § 13.04.030; D. C. Code § 16–2316 (a) (Supp. 1971).

States by judicial decision.[8] In 10 States statutes provide for a jury trial under certain circumstances.[9]

10. Since *Gault* and since *Duncan* the great majority of States, in addition to Pennsylvania and North Carolina, that have faced the issue have concluded that the considerations that led to the result in those two cases do not compel trial by jury in the juvenile court. *In re Fucini,* 44 Ill. 2d 305, 255 N. E. 2d 380 (1970); *Bible* v. *State,* —— Ind. ——, 254 N. E. 2d 319 (1970); *Dryden* v. *Commonwealth,* 435 S. W. 2d 457 (Ky. 1968); *In re Johnson,* 254 Md. 517, 255 A. 2d 419 (1969); *Hopkins* v. *Youth Court,* 227 So. 2d 282 (Miss. 1969); *In re J. W.,* 106 N. J. Super. 129, 254 A. 2d 334 (1969); *In re D.,* 27 N. Y. 2d 90, 261 N. E. 2d 627 (1970); *In re Agler,* 19 Ohio St. 2d 70, 249 N. E. 2d 808 (1969); *State* v. *Turner,* 253 Ore. 235, 453 P. 2d 910 (1969). See *In re Estes* v. *Hopp,* 73 Wash. 2d 263, 438 P. 2d 205 (1968); *McMullen* v. *Geiger,* 184 Neb. 581, 169 N. W. 2d 431 (1969). To the contrary are *Peyton* v. *Nord,* 78 N. M. 717, 437 P. 2d 716 (1968), and, *semble, Nieves* v. *United States,* 280 F. Supp. 994 (SDNY 1968).

11. Stopping short of proposing the jury trial for juvenile proceedings are the Uniform Juvenile Court Act, § 24 (a), approved in July 1968 by the National Conference of Commissioners on Uniform State Laws;

---

[8] *In re Daedler,* 194 Cal. 320, 228 P. 467 (1924); *Cinque* v. *Boyd,* 99 Conn. 70, 121 A. 678 (1923); *In re Fletcher,* 251 Md. 520, 248 A. 2d 364 (1968); *Commonwealth* v. *Page,* 339 Mass. 313, 316, 159 N. E. 2d 82, 85 (1959); *In re Perham,* 104 N. H. 276, 184 A. 2d 449 (1962).

[9] Colo. Rev. Stat. Ann. § 37–19–24 (Supp. 1965); Kan. Stat. Ann. § 38–808 (Supp. 1969); Mich. Comp. Laws § 712A.17 (1948); Mont. Rev. Codes Ann. § 10–604.1 (Supp. 1969); Okla. Stat. Ann., Tit. 10, § 1110 (Supp. 1970); S. D. Comp. Laws § 26–8–31 (1967); Tex. Civ. Stat., Art. 2338–1, § 13 (b) (Supp. 1970); W. Va. Code Ann. § 49–5–6 (1966); Wis. Stat. Ann. § 48.25 (2) (Supp. 1971); Wyo. Stat. Ann. § 14–115.24 (Supp. 1971).

the Standard Juvenile Court Act, Art. V, § 19, proposed by the National Council on Crime and Delinquency (see W. Sheridan, Standards for Juvenile and Family Courts 73, Dept. of H. E. W., Children's Bureau Pub. No. 437–1966); and the Legislative Guide for Drafting Family and Juvenile Court Acts § 29 (a) (Dept. of H. E. W., Children's Bureau Pub. No. 472–1969).

12. If the jury trial were to be injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial. It is of interest that these very factors were stressed by the District Committee of the Senate when, through Senator Tydings, it recommended, and Congress then approved, as a provision in the District of Columbia Crime Bill, the abolition of the jury trial in the juvenile court. S. Rep. No. 91–620, pp. 13–14 (1969).

13. Finally, the arguments advanced by the juveniles here are, of course, the identical arguments that underlie the demand for the jury trial for criminal proceedings. The arguments necessarily equate the juvenile proceeding—or at least the adjudicative phase of it—with the criminal trial. Whether they should be so equated is our issue. Concern about the inapplicability of exclusionary and other rules of evidence, about the juvenile court judge's possible awareness of the juvenile's prior record and of the contents of the social file; about repeated appearances of the same familiar witnesses in the persons of juvenile and probation officers and social workers—all to the effect that this will create the likelihood of pre-judgment—chooses to ignore, it seems to us, every aspect of fairness, of concern, of sympathy, and of paternal attention that the juvenile court system contemplates.

If the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence. Perhaps that ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it.

*Affirmed.*

MR. JUSTICE WHITE, concurring.

Although the function of the jury is to find facts, that body is not necessarily or even probably better at the job than the conscientious judge. Nevertheless, the consequences of criminal guilt are so severe that the Constitution mandates a jury to prevent abuses of official power by insuring, where demanded, community participation in imposing serious deprivations of liberty and to provide a hedge against corrupt, biased, or political justice. We have not, however, considered the juvenile case a criminal proceeding within the meaning of the Sixth Amendment and hence automatically subject to all of the restrictions normally applicable in criminal cases. The question here is one of due process of law and I join the plurality opinion concluding that the States are not required by that clause to afford jury trials in juvenile courts where juveniles are charged with improper acts.

The criminal law proceeds on the theory that defendants have a will and are responsible for their actions. A finding of guilt establishes that they have chosen to engage in conduct so reprehensible and injurious to others that they must be punished to deter them and others from crime. Guilty defendants are considered blameworthy; they are branded and treated as such, however much the State also pursues rehabilitative ends in the criminal justice system.

For the most part, the juvenile justice system rests on more deterministic assumptions. Reprehensible acts by

juveniles are not deemed the consequence of mature and malevolent choice but of environmental pressures (or lack of them) or of other forces beyond their control. Hence, the state legislative judgment not to stigmatize the juvenile delinquent by branding him a criminal; his conduct is not deemed so blameworthy that punishment is required to deter him or others. Coercive measures, where employed, are considered neither retribution nor punishment. Supervision or confinement is aimed at rehabilitation, not at convincing the juvenile of his error simply by imposing pains and penalties. Nor is the purpose to make the juvenile delinquent an object lesson for others, whatever his own merits or demerits may be. A typical disposition in the juvenile court where delinquency is established may authorize confinement until age 21, but it will last no longer and within that period will last only so long as his behavior demonstrates that he remains an unacceptable risk if returned to his family. Nor is the authorization for custody until 21 any measure of the seriousness of the particular act that the juvenile has performed.

Against this background and in light of the distinctive purpose of requiring juries in criminal cases, I am satisfied with the Court's holding. To the extent that the jury is a buffer to the corrupt or overzealous prosecutor in the criminal law system, the distinctive intake policies and procedures of the juvenile court system to a great extent obviate this important function of the jury. As for the necessity to guard against judicial bias, a system eschewing blameworthiness and punishment for evil choice is itself an operative force against prejudice and short-tempered justice. Nor where juveniles are involved is there the same opportunity for corruption to the juvenile's detriment or the same temptation to use the courts for political ends.

Not only are those risks that mandate juries in criminal cases of lesser magnitude in juvenile court adjudications, but the consequences of adjudication are less severe than those flowing from verdicts of criminal guilt. This is plainly so in theory, and in practice there remains a substantial gulf between criminal guilt and delinquency, whatever the failings of the juvenile court in practice may be. Moreover, to the extent that current unhappiness with juvenile court performance rests on dissatisfaction with the vague and overbroad grounds for delinquency adjudications, with faulty judicial choice as to disposition after adjudication, or with the record of rehabilitative custody, whether institutional or probationary, these shortcomings are in no way mitigated by providing a jury at the adjudicative stage.

For me there remain differences of substance between criminal and juvenile courts. They are quite enough for me to hold that a jury is not required in the latter. Of course, there are strong arguments that juries are desirable when dealing with the young, and States are free to use juries if they choose. They are also free, if they extend criminal court safeguards to juvenile court adjudications, frankly to embrace condemnation, punishment, and deterrence as permissible and desirable attributes of the juvenile justice system. But the Due Process Clause neither compels nor invites them to do so.

MR. JUSTICE BRENNAN, concurring in the judgment in No. 322 and dissenting in No. 128.

I agree with the plurality opinion's conclusion that the proceedings below in these cases were not "criminal prosecutions" within the meaning of the Sixth Amendment. For me, therefore, the question in these cases is whether jury trial is among the "essentials of due process and fair treatment," *In re Gault*, 387 U. S. 1, 30 (1967), required during the adjudication of a charge of delinquency based

554

upon acts that would constitute a crime if engaged in by an adult. See *In re Winship,* 397 U. S. 358, 359 and n. 1 (1970). This does not, however, mean that the interests protected by the Sixth Amendment's guarantee of jury trial in all "criminal prosecutions" are of no importance in the context of these cases. The Sixth Amendment, where applicable, commands that these interests be protected by a particular procedure, that is, trial by jury. The Due Process Clause commands, not a particular procedure, but only a result: in my Brother BLACKMUN's words, "fundamental fairness . . . [in] factfinding." In the context of these and similar juvenile delinquency proceedings, what this means is that the States are not bound to provide jury trials on demand so long as some other aspect of the process adequately protects the interests. that Sixth Amendment jury trials are intended to serve.[1]

In my view, therefore, the due process question cannot be decided upon the basis of general characteristics of juvenile proceedings, but only in terms of the adequacy of a particular state procedure to "protect the [juvenile] from oppression by the Government," *Singer* v. *United States,* 380 U. S. 24, 31 (1965), and to protect him against "the compliant, biased, or eccentric judge." *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968).

Examined in this light, I find no defect in the Pennsylvania cases before us. The availability of trial by jury allows an accused to protect himself against possible oppression by what is in essence an appeal to the community conscience, as embodied in the jury that hears

---

[1] "A criminal process which was fair and equitable but used no juries is easy to imagine. It would make use of alternative guarantees and protections which would serve the purposes that the jury serves in the English and American systems." *Duncan* v. *Louisiana,* 391 U. S. 145, 150 n. 14 (1968). This conclusion is, of course, inescapable in light of our decisions that petty criminal offenses may be tried without a jury notwithstanding the defendant's request. *E. g., District of Columbia* v. *Clawans,* 300 U. S. 617 (1937).

his case. To some extent, however, a similar protection may be obtained when an accused may in essence appeal to the community at large, by focusing public attention upon the facts of his trial, exposing improper judicial behavior to public view, and obtaining, if necessary, executive redress through the medium of public indignation. Of course, the Constitution, in the context of adult criminal trials, has rejected the notion that public trial is an adequate substitute for trial by jury in serious cases. But in the context of juvenile delinquency proceedings, I cannot say that it is beyond the competence of a State to conclude that juveniles who fear that delinquency proceedings will mask judicial oppression may obtain adequate protection by focusing community attention upon the trial of their cases. For, however much the juvenile system may have failed in practice, its very existence as an ostensibly beneficent and noncriminal process for the care and guidance of young persons demonstrates the existence of the community's sympathy and concern for the young. Juveniles able to bring the community's attention to bear upon their trials may therefore draw upon a reservoir of public concern unavailable to the adult criminal defendant. In the Pennsylvania cases before us, there appears to be no statutory ban upon admission of the public to juvenile trials.[2] Appellants themselves, without contradiction, assert that "the press is generally admitted" to juvenile delinquency proceedings in Philadelphia.[3] Most important, the record in these

---

[2] The generally applicable statute, Pa. Stat. Ann., Tit. 11, § 245 (1965), merely provides that juvenile proceedings shall be "separate" from regular court business. Pa. Stat. Ann., Tit. 11, § 269–402 (1965), requiring exclusion of the general public from juvenile hearings, applies only to Allegheny County. Both of the instant cases were tried in Philadelphia County.

[3] "The judges of the Philadelphia Juvenile Court exercise varying degrees of control over admission to the courtroom, but the press is generally admitted . . . ." Brief for Appellants 9 n. 9.

cases is bare of any indication that any person whom appellants sought to have admitted to the courtroom was excluded. In these circumstances, I agree that the judgment in No. 322 must be affirmed.

The North Carolina cases, however, present a different situation. North Carolina law either permits or requires exclusion of the general public from juvenile trials.[4] In the cases before us, the trial judge "ordered the general public excluded from the hearing room and stated that only officers of the court, the juveniles, their parents or guardians, their attorney and witnesses would be present for the hearing," *In re Burrus,* 4 N. C. App. 523, 525, 167 S. E. 2d 454, 456 (1969), notwithstanding petitioners' repeated demand for a public hearing. The cases themselves, which arise out of a series of demonstrations by black adults and juveniles who believed that the Hyde County, North Carolina, school system unlawfully discriminated against black schoolchildren, present a paradigm of the circumstances in which there may be a substantial "temptation to use the courts for political ends." Opinion of MR. JUSTICE WHITE, *ante,* at 552. And finally, neither the opinions supporting the judgment nor the respondent in No. 128 has pointed to any feature of North Carolina's juvenile proceedings that could substitute for public or jury trial in protecting the petitioners against misuse of the judicial process. Cf. *Duncan* v. *Louisiana,* 391 U. S. 145, 188, 193 (1968) (HARLAN, J., dissenting) (availability of resort to "the political proc-

---

[4] N. C. Gen. Stat. § 110–24 (1966), in force at the time of these trials, appears on its face to permit but not require such exclusion, as does identical language in the present statute, N. C. Gen. Stat. § 7A–285 (1969). The North Carolina Supreme Court in the present cases has read these statutes as a legislative determination "that a public hearing is [not] in the best interest of the youthful offender." *In re Burrus,* 275 N. C. 517, 530, 169 S. E. 2d 879, 887 (1969).

ess" is an alternative permitting States to dispense with jury trials). Accordingly, I would reverse the judgment in No: 128.

MR. JUSTICE HARLAN, concurring in the judgments.

If I felt myself constrained to follow *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), which extended the Sixth Amendment right of jury trial to the States, I would have great difficulty, upon the premise seemingly accepted in my Brother BLACKMUN's opinion, in holding that the jury trial right does not extend to state juvenile proceedings. That premise is that juvenile delinquency proceedings have in practice actually become in many, if not all, respects criminal trials. But see my concurring and dissenting opinion in *In re Gault,* 387 U. S. 1, 65 (1967). If that premise be correct, then I do not see why, given *Duncan,* juveniles as well as adults would not be constitutionally entitled to jury trials, so long as juvenile delinquency systems are not restructured to fit their original purpose. When that time comes I would have no difficulty in agreeing with my Brother BLACKMUN, and indeed with my Brother WHITE, the author of *Duncan,* that juvenile delinquency proceedings are beyond the pale of *Duncan.*

I concur in the judgments in these cases, however, on the ground that criminal jury trials are not constitutionally required of the States, either as a matter of Sixth Amendment law or due process. See my concurring and dissenting opinion in *Duncan* and my separate opinion in *Williams* v. *Florida,* 399 U. S. 78, 118–119 (1970).

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE MARSHALL concur, dissenting.

These cases from Pennsylvania and North Carolina present the issue of the right to a jury trial for offenders charged in juvenile court and facing a possible incarcer-

ation until they reach their majority. I believe the guarantees of the Bill of Rights, made applicable to the States by the Fourteenth Amendment, require a jury trial.

In the Pennsylvania cases one of the appellants was charged with robbery (Pa. Stat. Ann., Tit. 18, § 4704 (1963)), larceny (Pa. Stat. Ann., Tit. 18, § 4807), and receiving stolen goods (Pa. Stat. Ann., Tit. 18, § 4817) as acts of juvenile delinquency. Pa. Stat. Ann., Tit. 11, § 246 (1965). He was found a delinquent and placed on probation. The other appellant was charged with assault and battery on a police officer (Pa. Stat. Ann., Tit. 18, § 4708) and conspiracy (Pa. Stat. Ann., Tit. 18, § 4302) as acts of juvenile delinquency. On a finding of delinquency he was committed to a youth center. Despite the fact that the two appellants, aged 15 and 16, would face potential incarceration until their majority, Pa. Stat. Ann., Tit. 11, § 250, they were denied a jury trial.

In the North Carolina cases petitioners are students, from 11 to 15 years of age, who were charged under one of three criminal statutes: (1) "disorderly conduct" in a public building, N. C. Gen. Stat. § 14–132 (1969); (2) "wilful" interruption or disturbance of a public or private school, N. C. Gen. Stat. § 14–273; or (3) obstructing the flow of traffic on a highway or street, N. C. Gen. Stat. § 20–174.1 (1965 and Supp. 1969).

Conviction of each of these crimes would subject a person, whether juvenile or adult, to imprisonment in a state institution. In the case of these students the possible term was six to 10 years; it would be computed for the period until an individual reached the age of 21. Each asked for a jury trial which was denied. The trial judge stated that the hearings were juvenile hearings, not criminal trials. But the issue in each case was whether

they had violated a state criminal law. The trial judge found in each case that the juvenile had committed "an act for which an adult may be punished by law" and held in each case that the acts of the juvenile violated one of the criminal statutes cited above. The trial judge thereupon ordered each juvenile to be committed to the state institution for the care of delinquents and then placed each on probation for terms from 12 to 24 months.

We held in *In re Gault*, 387 U. S. 1, 13, that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." As we noted in that case, the Juvenile Court movement was designed to avoid procedures to ascertain whether the child was "guilty" or "innocent" but to bring to bear on these problems a "clinical" approach. *Id.*, at 15, 16. It is, of course, not our task to determine as a matter of policy whether a "clinical" or "punitive" approach to these problems should be taken by the States. But where a State uses its juvenile court proceedings to prosecute a juvenile for a criminal act and to order "confinement" until the child reaches 21 years of age or where the child at the threshold of the proceedings faces that prospect, then he is entitled to the same procedural protection as an adult. As MR. JUSTICE BLACK said in *In re Gault, supra,* at 61 (concurring):

> "Where a person, infant or adult, can be seized by the State, charged, and convicted for violating a state criminal law, and then ordered by the State to be confined for six years, I think the Constitution requires that he be tried in accordance with the guarantees of all the provisions of the Bill of Rights made applicable to the States by the Fourteenth Amendment. Undoubtedly this would be true of an adult defendant, and it would be a plain denial of equal protection of the laws—an invidious dis-

crimination—to hold that others subject to heavier punishments could, because they are children, be denied these same constitutional safeguards."

Just as courts have sometimes confused delinquency with crime, so have law enforcement officials treated juveniles not as delinquents but as criminals. As noted in the President's Crime Commission Report:

"In 1965, over 100,000 juveniles were confined in adult institutions. Presumably most of them were there because no separate juvenile detention facilities existed. Nonetheless, it is clearly undesirable that juveniles be confined with adults." President's Commission on Law Enforcement and Administration of Justice, Challenge of Crime in a Free Society 179 (1967).

Even when juveniles are not incarcerated with adults the situation may be no better. One Pennsylvania correctional institution for juveniles is a brick building with barred windows, locked steel doors, a cyclone fence topped with barbed wire, and guard towers. A former juvenile judge described it as "a maximum security prison for adjudged delinquents." *In re Bethea,* 215 Pa. Super. 75, 76, 257 A. 2d 368, 369.

In the present cases imprisonment or confinement up to 10 years was possible for one child and each faced at least a possible five-year incarceration. No adult could be denied a jury trial in those circumstances. *Duncan* v. *Louisiana,* 391 U. S. 145, 162. The Fourteenth Amendment, which makes trial by jury provided in the Sixth Amendment applicable to the States, speaks of denial of rights to "any person," not denial of rights to "any adult person"; and we have held indeed that where a juvenile is charged with an act that would constitute a crime if committed by an adult, he is entitled to be tried under a standard of proof beyond a reasonable doubt. *In re Winship,* 397 U. S. 358.

In *DeBacker* v. *Brainard,* 396 U. S. 28, 33, 35, MR. JUSTICE BLACK and I dissented from a refusal to grant a juvenile, who was charged with forgery, a jury trial merely because the case was tried before *Duncan* v. *Louisiana,* 391 U. S. 145, was decided. MR. JUSTICE BLACK, after noting that a juvenile being charged with a criminal act was entitled to certain constitutional safeguards, *viz.,* notice of the issues, benefit of counsel, protection against compulsory self-incrimination, and confrontation of the witnesses against him, added:

> "I can see no basis whatsoever in the language of the Constitution for allowing persons like appellant the benefit of those rights and yet denying them a jury trial, a right which is surely one of the fundamental aspects of criminal justice in the English-speaking world." 396 U. S., at 34.

I added that by reason of the Sixth and Fourteenth Amendments the juvenile is entitled to a jury trial

> "as a matter of right where the delinquency charged is an offense that, if the person were an adult, would be a crime triable by jury. Such is this case, for behind the facade of delinquency is the crime of forgery." *Id.,* at 35.

Practical aspects of these problems are urged against allowing a jury trial in these cases.* They have been

---

*The Public Defender Service for the District of Columbia and the Neighborhood Legal Services Program of Washington, D. C., have filed a brief *amicus* in which the results of a survey of jury trials in delinquency cases in the 10 States requiring jury trials plus the District of Columbia are set forth. The cities selected were mostly large metropolitan areas. Thirty juvenile courts processing about 75,000 juvenile cases a year were canvassed:

"[W]e discovered that during the past five and a half years, in 22 out of 26 courts surveyed, cumulative requests for jury trials totaled 15 or less. In the remaining five courts in our sample, statistics were unavailable. During the same period, in 26 out of 29

562

answered by Judge De Ciantis of the Family Court of Providence, Rhode Island, in a case entitled *In the Matter of McCloud,* decided January 15, 1971. A juvenile was charged with the rape of a 17-year-old female and Judge De Ciantis granted a motion for a jury trial in an opinion, a part of which I have attached as an appendix to this dissent. He there concludes that "the real traumatic" experience of incarceration without due process is "the feeling of being deprived of basic rights." He adds:

> "The child who feels that he has been dealt with fairly and not merely expediently or as speedily as possible will be a better prospect for rehabilitation. Many of the children who come before the court come from broken homes, from the ghettos; they often suffer from low self-esteem; and their behavior is frequently a symptom of their own feelings of inadequacy. Traumatic experiences of denial of basic rights only accentuate the past deprivation and contribute to the problem. Thus, a general societal attitude of acceptance of the juvenile as a person entitled to the same protection as an adult may be the true beginning of the rehabilitative process."

courts the cumulative number of jury trials actually held numbered 15 or less, with statistics unavailable for two courts in our sample. For example, in Tulsa, Oklahoma, counsel is present in 100% of delinquency cases, but only one jury trial has been requested and held during the past five and one-half years. In the Juvenile Court of Fort Worth, Texas, counsel is also present in 100% of the cases, and only two jury trials have been requested since 1967. The Juvenile Court in Detroit, Michigan, reports that counsel is appointed in 70–80% of its delinquency cases, but thus far in 1970, it has had only four requests for a jury. Between 1965 and 1969 requests for juries were reported as 'very few.'

"In only four juvenile courts in our sample has there clearly been a total during the past five and one-half years of more than 15 jury trial requests and/or more than 15 such trials held."

The four courts showing more than 15 requests for jury trials were Denver, Houston, Milwaukee, and Washington, D. C.

Judge De Ciantis goes on to say that "[t]rial by jury will provide the child with a safeguard against being prejudged" by a judge who may well be prejudiced by reports already submitted to him by the police or case-workers in the case. Indeed the child, the same as the adult, is in the category of those described in the Magna Carta:

> "No freeman may be . . . imprisoned . . . except by the lawful judgment of his peers, or by the law of the land."

These cases should be remanded for trial by jury on the criminal charges filed against these youngsters.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

De Ciantis, J.: The defendant, who will hereinafter be referred to as a juvenile, on the sixth day of September, 1969, was charged with Rape upon a female child, seventeen years old, in violation of Title 11, Chapter 37, Section 1, of the General Laws of 1956.

• • • • •

## TRAUMA

The fact is that the procedures which are now followed in juvenile cases are far more traumatic than the potential experience of a jury trial. Who can say that a boy who is arrested and handcuffed, placed in a lineup, transported in vehicles designed to convey dangerous criminals, placed in the same kind of a cell as an adult, deprived of his freedom by lodging him in an institution where he is subject to be transferred to the state's prison and in the "hole" has not undergone a traumatic experience?

The experience of a trial with or without a jury is meant to be impressive and meaningful. The fact that a juvenile realizes that his case will be decided by twelve

objective citizens would allow the court to retain its meaningfulness without causing any more trauma than a trial before a judge who perhaps has heard other cases involving the same juvenile in the past and may be influenced by those prior contacts. To agree that a jury trial would expose a juvenile to a traumatic experience is to lose sight of the real traumatic experience of incarceration without due process. The real traumatic experience is the feeling of being deprived of basic rights. [In] *In the matter of Reis*,[1] this Court indicated the inadequacies of the procedure under which our court operates. A judge who receives facts of a case from the police and approves the filing of a petition based upon those facts may be placed in the untenable position of hearing a charge which he has approved. His duty is to adjudicate on the evidence introduced at the hearing and not be involved in any pre-adjudicatory investigation.

It is contrary to the fundamental principles of due process for the court to be compelled, as it is in this state, to act as a one-man grand jury, then sit in judgment on its own determination arising out of the facts and proceedings which he conducted. This responsibility belongs with a jury.

## BACKLOG

An argument has been made that to allow jury trials would cause a great backlog of cases and, ultimately, would impair the functioning of the juvenile court. The fact however is that there is no meaningful evidence that granting the right to jury trials will impair the function of the court. Some states permit jury trials in *all* juvenile court cases; few juries have been demanded, and there is no suggestion from these courts that jury trials have impeded the system of juvenile justice.

---

[1] Reis, 7 CrL 2151 (1970).

In Colorado, where jury trials have been permitted by statute, Judge Theodore Rubin of the Denver Juvenile Court has indicated that jury trials are an important safeguard and that they have not impaired the functioning of the Denver Juvenile Courts. For example, during the first seven months of 1970, the two divisions of the Denver Juvenile Court have had fewer than two dozen jury trials, in both delinquency and dependency-neglect cases. In Michigan, where juveniles are also entitled to a jury trial, Judge Lincoln of the Detroit Juvenile Court indicates that his court has had less than five jury trials in the year 1969 to 1970.

The recent Supreme Court decision of *Williams* vs *Florida*, [399 U. S. 78] (June 22, 1970), which held that the constitutional right to trial by jury in criminal cases does not require a twelve-member jury, could be implemented to facilitate the transition to jury trials. A jury of less than twelve members would be less cumbersome, less "formal," and less expensive than the regular twelve-member jury, and yet would provide the accused with objective fact-finders.

In fact the very argument of expediency, suggesting "supermarket" or "assembly-line" justice is one of the most forceful arguments in favor of granting jury trials. By granting the juvenile the right to a jury trial, we would, in fact, be protecting the accused from the judge who is under pressure to move the cases, the judge with too many cases and not enough time. It will provide a safeguard against the judge who may be prejudiced against a minority group or who may be prejudiced against the juvenile brought before him because of some past occurrence which was heard by the same judge.

There have been criticisms that juvenile court judges, because of their hearing caseload, do not carefully weigh the evidence in the adjudicatory phase of the proceedings.

It is during this phase that the judge must determine whether in fact the evidence has been established beyond a reasonable doubt that the accused committed the acts alleged in the petition. Regardless of the merit of these criticisms, they have impaired the belief of the juveniles, of the bar and of the public as to the opportunity for justice in the juvenile court. Granting the juvenile the right to demand that the facts be determined by a jury will strengthen the faith of all concerned parties in the juvenile system.

.        .        .        .        .

It is important to note, at this time, a definite side benefit of granting jury trials, *i. e.*, an aid to rehabilitation. The child who feels that he has been dealt with fairly and not merely expediently or as speedily as possible will be a better prospect for rehabilitation. Many of the children who come before the court come from broken homes, from the ghettos; they often suffer from low self-esteem; and their behavior is frequently a symptom of their own feelings of inadequacy. Traumatic experiences of denial of basic rights only accentuate the past deprivation and contribute to the problem. Thus, a general societal attitude of acceptance of the juvenile as a person entitled to the same protection as an adult may be the true beginning of the rehabilitative process.

## PUBLIC TRIAL

Public trial in the judgment of this Court does not affect the juvenile court philosophy.

[In] *In re Oliver* [2] Mr. Justice Black reviews the history of the public trial. Its origins are obscure, but it seems to have evolved along with the jury trial guarantee in English common law and was then adopted as a pro-

[2] 333 U. S. 257.

vision of the Federal Constitution as well as by most state constitutions. Among the benefits of a public trial are the following:

1. "Public trials come to the attention of key witnesses unknown to the parties. These witnesses may then voluntarily come forward and give important testimony."

2. "The spectators learn about their government and acquire confidence in their judicial remedies."

3. "The knowledge that every *criminal* trial is subject to contemporaneous review in the [forum] of public opinion is an effective restraint on possible abuse of judicial power." (P. 270.)

Justice Black has nothing to say on the question of whether a public trial acts as a deterrent to crime, but it is clear that he believes *publicity to improve the quality of criminal justice, both theoretically and practically.*

As for the juvenile trial issue, he writes:

"Whatever may be the classification of juvenile court proceedings, they are often conducted without admitting all the public. But it has never been the practice to wholly exclude parents, relatives, and friends, or to refuse juveniles the benefit of counsel." (P. 266.)

In fact, the juvenile proceedings as presently conducted are far from secret. Witnesses for the prosecution and for the defense, social workers, court reporters, students, police trainees, probation counselors, and sheriffs are present in the courtroom. Police, the Armed Forces, the Federal Bureau of Investigation obtain information and have access to the police files. There seems no more reason to believe that a jury trial would destroy confidentiality than would witnesses summoned to testify.

The Court also notes the report of the PRESIDENT'S COMMISSION O[N] LAW ENFORCEMENT AND ADMINISTRATION OF JUSTICE, THE CHALLENGE OF CRIME IN A FREE SOCIETY 75 (1967), wherein it is stated:

"A juvenile's adjudication record is required by the law of most jurisdictions to be private and confidential; in practice the confidentiality of those reports is often violated." Furthermore, "[s]tatutory restrictions almost invariably apply only to court records, and even as to those the evidence is that many courts routinely furnish information to the FBI and the military, and on request to government agencies and even to private employers."

## JUDGE'S EXPERTISE

The Court is also aware of the argument that the juvenile court was created to develop judges who were experts in sifting out the real problems behind a juvenile's breaking the law; therefore, to place the child's fate in the hands of a jury would defeat that purpose. This will, however, continue to leave the final decision of disposition solely with the judge. The role of the jury will be only to ascertain whether the facts, which give the court jurisdiction, have been established beyond a reasonable doubt. The jury will not be concerned with social and psychological factors. These factors, along with prior record, family and educational background, will be considered by the judge during the dispositional phase.

Taking into consideration the social background and other facts, the judge, during the dispositional phase, will determine what disposition is in the best interests of the child and society. It is at this stage that a judge's expertise is most important, and the granting of a jury trial

will not prevent the judge from carrying out the basic philosophy of the juvenile court.

Trial by jury will provide the child with a safeguard against being prejudged. The jury clearly will have no business in learning of the social report or any of the other extraneous matter unless properly introduced under the rules of evidence. Due process demands that the trier of facts should not be acquainted with any of the facts of the case or have knowledge of any of the circumstances, whether through officials in his own department or records in his possession. If the accused believes that the judge has read an account of the facts submitted by the police or any other report prior to the adjudicatory hearing and that this may prove prejudicial, he can demand a jury and insure against such knowledge on the part of the trier of the facts.

## WAIVER OF JURY TRIAL

Counsel also questions whether a child can waive his right to a jury trial or, in fact, whether a parent or counsel may waive.

When the waiver comes up for hearing, the Court could, at its discretion, either grant or refuse the juvenile's waiver of a jury trial, and/or appoint a guardian or legal counsel to advise the child.

My experience has shown that the greatest percentage of juveniles who appear before the court in felony cases have lived appalling lives due to parental neglect and brutality, lack of normal living conditions, and poverty. This has produced in them a maturity which is normally acquired much later in life. They are generally well aware of their rights in a court of law. However, in those cases where a child clearly needs guidance, the court-appointed guardian or attorney could explain to him the implications of a waiver. The juvenile's rights and interests would thus be protected every bit as strin-

gently as they are today before he is allowed to plead guilty or not guilty to a complaint. A guilty plea is, after all, a waiver of the right to trial altogether.

Counsel is placed with the responsibility of explaining to the juvenile the significance of guilty and *nolo contendere* pleas, of instructing the juvenile on the prerogative to take the witness stand, and is expected to advise his client in the same manner as he would an adult about to stand trial. And now counsel suggests to the Court that counsel is not capable of explaining and waiving the right to a jury trial. The Court fails to see the distinction between this waiver and the absolute waiver, to wit, a guilty plea. Counsel should act in the best interest of his client, even if this may be in conflict with the parents. On a number of occasions this Court has appointed counsel for a juvenile whose parents could not afford to retain private counsel, and where the parents' interests were in conflict with those of the child. This procedure will be continued and the Court will continue to rely on the good judgment of the bar.

The Court could easily require that a waiver of a jury trial be made in person by the juvenile in writing, in open court, with the consent and approval of the Court and the attorney representing both the juvenile and the state. The judge could ascertain as to whether the juvenile can intelligently waive his right and, if necessary, appoint counsel to advise the youth as to the implications connected with the waiver. This could be accomplished without any difficulty through means presently available to the Court.

## JURY OF PEERS

One of the most interesting questions raised is that concerning the right of a juvenile to a trial by his peers. Counsel has suggested that a jury of a juvenile's peers

would be composed of other juveniles, that is, a "teenage jury." Webster's Dictionary, Second Edition, 1966, defines a peer as an equal, one of the same rank, quality, value. The word "peers" means nothing more than citizens, *In re Grilli*, 179 N. Y. S. 795, 797. The phrase "judgment of his peers" means at common law, a trial by a jury of twelve men, *State vs Simons*, 61 Kan. 752. "Judgment of his peers" is a term expressly borrowed from the Magna Charta, and it means a trial by jury, *Ex parte Wagner*, 58 Okl. Cr. 161. The Declaration of Independence also speaks of the equality of *all* men. Are we now to say that a juvenile is a second-class citizen, not equal to an adult? The Constitution has never been construed to say women must be tried by their peers, to wit, by all-female juries, or Negroes by all-Negro juries.

The only restriction on the makeup of the jury is that there can be no systematic exclusion of those who meet local and federal requirements, in particular, voting qualifications.

The Court notes that presently in some states 18-year-olds can vote. Presumably, if they can vote, they may also serve on juries. Our own legislature has given first passage to an amendment to the Constitution to permit 18-year-olds to vote. Thus, it is quite possible that we will have teenage jurors sitting in judgment of their so-called "peers."

## CRIMINAL PROCEEDING

The argument that the adjudication of delinquency is not the equivalent of criminal process is spurious. This Court has discussed the futility of making distinctions on the basis of labels in prior decisions. Because the legislature dictates that a child who commits a felony shall be called a delinquent does not change the nature of the crime. Murder is murder; robbery is robbery—they are

both criminal offenses, not civil, regardless and independent of the age of the doer.

It is noteworthy that in our statute there is not an express statutory provision indicating that the proceedings are civil. Trial by jury in Rhode Island is guaranteed to *all* persons, whether in criminal cases or in civil cases. That right existed prior to the adoption of the Constitution; and certainly whether one is involved in a civil or criminal proceeding of the Family Court in which his "liberty" is to be "taken" "imprisoned" "outlawed" and "banished" he is entitled to a trial by jury. (*Henry* vs *Cherry & Webb,* 30 R. I. 13, at 30).

This Court believes that although the juvenile court was initially created as a social experiment, it has not ceased to be part of the judicial system. In view of the potential loss of liberty at stake in the proceeding, this Court is compelled to accord due process to all the litigants who come before it; and, therefore, all of the provisions of the Bill of Rights, including trial by jury, must prevail.

The Court concludes that the framers of our Constitution never intended to place the power in any one man or official, and take away the "protection of the law from the rights of an individual." It meant "to secure the blessings of liberty to themselves and posterity." The Constitution was written with the philosophy based upon a composite of all of the most liberal ideas which came down through the centuries; The Magna Charta, the Petition of Rights, the Bill of Rights and the Rules of Common Law; and the keystone is the preservation of individual liberty. All these ideas were carefully inserted in our Constitution.

The juvenile is constitutionally entitled to a jury trial.