## STATE OF NEW JERSEY, IN THE INTEREST OF J. J., A JUVENILE.

Juvenile and Domestic Relations Court
Camden County

February 18, 1975.

*Mr. Robert Aaron Greenberg,* Assistant Prosecutor, for the State (*Mr. Thomas J. Shusted,* Prosecutor of Camden County, attorney).

*Mr. William C. Levine,* First Assistant Public Defender, for the juvenile (*Mr. Stanley Van Ness.* Public Defender, attorney).

KING, J. C. C., Temporarily Assigned. The juvenile was charged with the offense of breaking and entering into and larceny from a public school building on January 6, 1974. He appeared in the Camden County Juvenile and Domestic Relations Court at an informal hearing with his parents and without counsel on March 13, 1974 and admitted the allegations charged in the petition. The trial judge adjudicated the juvenile delinquent and placed him on probation for one year. His probation was conditioned upon obtaining entry into the Job Corps and in the interim attending weekly sessions at the probation office.

In July, 1974 a violation of probation was filed against the juvenile because he failed to fulfill the conditions of probation. A hearing on the violation of probation was scheduled. The original hearing court also scheduled a formal hearing on the original breaking and entering and larceny charges and required counsel to be present in the event that if an adjudication of delinquency resulted following formal hearing a disposition of commitment could be entertained as a possible alternative. See *R.* 5 :3–3, *In re Gault,*

387 *U. S.* 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). The original trial judge then recused himself on his own motion because of his previous familiarity with the matter.

Juvenile now moves before this successor court to dismiss the charges on the ground that a second and formal hearing, with the implication of possible commitment, would violate his rights to due process of law and would place him twice in jeopardy for the same offense, contrary to the State and Federal Constitutions, and the provisions of the statute, *N. J. S. A.* 2A:4–60. No suggestive or controlling precedent is available for the resolution of this problem.

A similar situation was considered in *State in the Interest of G. J.,* 108 *N. J. Super.* 186 (App. Div. 1969), *cert. den. 55 N. J.* 447 (1970). There the juvenile was not represented by counsel in the original informal proceeding at which she was adjudicated delinquent and placed on probation for chronic truancy. Subsequently, juvenile's absence from school persisted and she was charged with a violation of probation. At a formal hearing with *Gault* safeguards, including counsel, the court found that her continued truancy from school constituted a probation violation and her disposition was a commitment to the State Home for Girls. On appeal the juvenile urged that the commitment was illegal because it was based on a violation of probation resulting from her original determination of delinquency occurring at an informal hearing without counsel. The Appellate Division rejected that argument, reasoning that the commitment to the State Home was actually based on a new substantive finding of delinquency resulting from continuing truancy, rather than on a finding of a violation of probation. The fact that the matter came before the court on a violation of probation was not determinative so long as the underlying offense, chronic truancy, was sufficient in itself to support an adjudication and subsequent commitment.

██ In the present case the alleged violations of probation — failing to obtain entry into the Job Corps and failing to attend weekly counselling sessions as ordered — could not

support an independent adjudication of delinquency. The case of *G. J.* indicates that a court may not commit a juvenile for violation of probation alone, regardless of need for commitment or representation by counsel at the probation violation, if the original probation emanated from an uncounselled informal adjudication. The only possible way this present court may consider all of the options available in the treatment of this juvenile, including commitment or the threat of commitment if probation is not successful, would be to conduct a formal hearing on the original charges with all of the *Gault* safeguards, including counsel.

The pertinent section of the statute reads as follows:

All defenses available to an adult charged with a crime, offense or violation shall be available to a juvenile charged with committing an act of delinquency.

All cases arising under this act not referred as provided by sections 7 or 8 shall be heard and decided by the juvenile and domestic relations court without a jury. The right to be secure from unreasonable searches and seizures, the right not to be placed twice in jeopardy for the same offense, and the right of due process of law shall be applicable in cases arising under this act as in cases of persons charged with crime. [*N. J. S. A.* 2A:4-60]

This provision became effective on March 1, 1974 as part of the so-called "JINS" law (Juveniles In Need of Supervision), *N. J. S. A.* 2A:4-42 et seq., which concerns jurisdiction and proceedings in the juvenile court. A review of the legislative history available to the court is not enlightening as to any special intent or design to be implied by the inclusion of the proscription against double jeopardy in the legislation. In the absence of any special mention the court can only conclude a legislative intent to restate the historic common law and constitutional concept of jeopardy as a reminder that they pertain to our juvenile justice system. This court has no doubt that our State Supreme Court and Federal Supreme Court would find traditional concepts of double jeopardy "selectively incorporated" into a juvenile justice system if faced with the issue, and this court premises

its opinion on such an anticipated ruling. The Legislature instructs us in *N. J. S. A.* 2A:4–42 that the act should be construed to accomplish the following purposes:

a. To preserve the unity of the family whenever possible and to provide for the care, protection and wholesome mental and physical development of juveniles coming within the provisions of this act;

b. Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation;

c. To separate juveniles from the family environment only when necessary for their health, safety or welfare or in the interests of public safety.

This expressed intent reveals that the Legislature has retained the traditional view of the juvenile proceeding as a nonadversarial system with the *parens patriae* goal of treatment and aid to the child, aimed towards rehabilitation as the polestar rather than endowment of the process with punitive and criminal concepts. Some may argue that the distinction is illusory and casuistic, but the enunicated legislative purpose is clear. *State in the Interest of Carlos,* 48 *N. J.* 224 (1966), *State v. L. N.,* 109 *N. J. Super.* 278 (App. Div. 1970), aff'd *per cur.* 57 *N. J.* 165 (1970), *cert.* den. 402 *U. S.* 1009, 91 S. Ct. 2194, 29 L. Ed. 2d 431 (1971); Comment, 26 *Rutgers L. Rev.* 358, 361–363 (1973). At the same time, and consistent with the mandate of the United States Supreme Court as expressed by Mr. Justice Fortas in *Gault,* the Legislature has recognized the necessity for the constitutional domestication of the juvenile proceeding in the observance of due process standards of fundamental fairness. *In re Gault, supra* (requiring rights of notice, confrontation, counsel and possibly self-incrimination as a prerequisite to commitment); *In re Winship,* 397 *U. S.* 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (requiring proof beyond a reasonable doubt); *cf. McKeiver v. Pennsylvania,* 403 *U. S.* 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971) (no right to jury trial). In each instance the Supreme Court approached

the juvenile's assertion of constitutional rights by examining the role and purpose of the particular procedural safeguard within the criminal justice system and then analyzing the effect of imposing that safeguard on the presumed substantive benefits of the juvenile process, *i. e.,* informality, flexibility, confidentiality, speed of processing and opportunity for individual disposition and treatment rather than punishment.

Our New Jersey courts have traditionally followed the same approach, balancing the need for the protection which the particular procedural right would afford against the effect that right would have on the beneficial aspects of the juvenile process. In *State in the Interest of R. W.,* 115 *N. J. Super.* 286 (App. Div. 1971), aff'd *per cur.* 61 *N. J.* 118 (1972), the court rejected the juvenile's argument that his confession was inadmissible because he had not been given all of the *Miranda* warnings. The court stated:

> In short, the *Miranda* rule and its corollaries are not to be mechanically — "ruthlessly" — applied when dealing with juveniles of tender age. We think that instead the test must be whether the juvenile was treated with the utmost fairness and with every consideration that his age and all of the surrounding circumstances indicate should have been accorded him. [at 295 of 115 N. J. Super.]

In *State in the Interest of W. O.,* 100 *N. J. Super.* 358 (App. Div. 1968), the court could find no reason why the procedural safeguard of sequestration of witnesses, a valuable device to expose untruthfulness, should not be made available to juvenile defendants. In *State in the Interest of J. W.,* 57 *N. J.* 144 (1970), decided several months before the United States Supreme Court reached the same result in the *McKeiver* opinion, the contention for the institution of the jury trial in juvenile proceedings was rejected since it would not materially contribute to the fact-finding function of the court but would seriously limit the court's ability to function in its uniquely flexible and expeditious manner. See also, *State in the Interest of L. B.,* 99 *N. J. Super.* 589 (J. D. R.

Ct. 1968) (juvenile complaint need not be drawn with same exactitude as criminal complaint); *State in the Interest of K. V. N.*, 116 *N. J. Super.* 580 (App. Div. 1971), aff'd *per cur.* 60 *N. J.* 517 (1972) (no equal protection violation for different treatment of juvenile and adult offenders).

The constitutional and statutory safeguards against double jeopardy assure that the State with its great resources and awesome power will not be permitted to harass and oppress the individual citizen with multiple prosecutions or punishments for the same offense. *State v. Currie*, 41 *N. J.* 531, 535 (1964); *State v. Sims*, 65 *N. J.* 359, 371 (1974). The *Currie* decision emphasized that "in applying the prohibition against double jeopardy, the emphasis should be on underlying policies, rather than technicalities. The primary purpose should be fairness and fullfillment of reasonable expectations in the light of the constitutional and common law goals." 41 *N. J.* at 539.

In the present case the elements of harassment and oppression do not appear involved. The initial informal hearing afforded a somewhat minimally restrictive mode of treatment for the situation without any possible exposure to the serious consequence of incarceration. This initial informal hearing approach was not one required of the State but was afforded to the juvenile in the best spirit of *parens patriae*, hopefully to provide a less harsh remedy to resolve what the initial trial judge sincerely believed to be a budding and potentially serious problem. Certainly in dealing with all juvenile problems the court initially resorts to the least severe and restrictive feasible measure in an effort to find a solution. But that measure did not work here. As a result of the informal adjudication the juvenile was never in danger of a custodial disposition. His exposure to a formal hearing and its potential for an actual or suspended custodial sentence arises not from any capricious, whimsical or malicious activity by the State but from his own failure to fulfill the consensual terms of his probation.

The creation of the two types of hearings, formal and informal (essentially the requirement of counsel distinguishes the two), was an immediate consequence of Gault and was formalized by prior court rule, R. 5:9–1(c)–(e) (1967 rule amended in 1974). The dichotomy has since been deleted from the rules, but the practice continues in effect, both at the adjudicative level as well as at the initial intake level. The informal hearing allows the court to deal with each case in a uniquely flexible, speedy and individualized fashion. This procedure is similar to the pretrial diversionary program under R. 3:28 and the motion-to-suspend-proceeding in controlled dangerous substance possession cases under N. J. S. A. 24:21–27 where the matter is returned to court if the adult offender does not comply with the program. Jeopardy should not attach simply because the State agrees to the less onerous procedure.

Following an informal hearing the court may order any disposition specified in N. J. S. A. 2A:4–61 except commitment. Subsection (c) enables the court to place a delinquent juvenile on probation for a period not to exceed three years "upon such written conditions as the court deems will aid rehabilitation of the juvenile." Obviously the court must have some means by which to encourage compliance with the conditions of probation, or the entire process may become farcical and ineffective. To accept juvenile's position here would be to render the court powerless in its efforts to deal with a potentially serious social problem. Indeed, if further indifference to probation persists, a suspended sentence following a formal adjudication with the realistic alternative of incarceration may in many instances be sufficient to motivate cooperation with the probation program by the otherwise indifferent juvenile. Once the court's acknowledged impotent posture is publicized through the "grapevine" the entire process of informally adjudicated probation, so often to the benefit of the juvenile and society is jeopardized and demoralized. Havoc could be created in the probation programs

presently being utilized; general disrespect or the dilution of institutional morale in the probation department could follow.

A finding here in favor of juvenile's contention of double jeopardy would effectively oust the court of any meaningful jurisdiction over the child and deprive the State of any chance of helping the juvenile unless he commits another serious offense. This approach is not consistent with the historical philosophy of the juvenile court or the legislative intent. An institutional result would be the requirement of formal hearings in all cases in order to insure the meaningful enforcement of probation in the few where such enforcement is necessary. The court does not feel that compelling the juvenile to appear now at a first formal hearing, protected by the safeguards of *Gault* and its progeny, violates any fundamental right of the juvenile. Certainly any inculpatory statements made by the juvenile at the initial uncounselled informal hearing would not be admissible at the formal hearing. *Cf. State v. Boone,* 66 *N. J.* 38 (1974). On balance, the interests of the juvenile are well protected at all stages by this result.

It should be added that if the juvenile desires to urge prejudice as a result of a delay in his formal adjudicative hearing, this court will be alert to his contentions and give consideration to such an application within the confines of the principles as stated in *Barker v. Wingo,* 407 *U. S.* 514, 92 S. Ct. 2182, 33 *L. Ed.* 2d 101 (1972); *State v. Davis,* 131 *N. J. Super.* 484 (App. Div. 1974), and *State v. Smith,* 131 *N. J. Super.* 354 (App. Div. 1974), insofar as they relate to the juvenile justice system. Motion to dismiss is denied and the matter will be promptly listed for a formal hearing before a judge unacquainted with the matter.