Argued May 21, reversed and remanded June 28, 1974

In the Matter of Ralph Cardiel, a child.

STATE ex rel BENTON COUNTY JUVENILE
DEPARTMENT, *Respondent, v.* CARDIEL
(No. Cr-73-532), *Appellant.*

523 P2d 1057

*Todd G. Brown,* Corvallis, argued the cause and
filed the brief for appellant.

*W. Michael Gillette,* Solicitor General, Salem,

argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Scott McAlister, Assistant Attorney General, Salem.

Before Schwab, Chief Judge, and Langtry and Thornton, Judges.

LANGTRY, J.

This is an appeal from an order of the Benton County Circuit Court remanding Ralph Cardiel, 16 years of age, (hereafter Ralph) to adult court. The petition in the juvenile department of the circuit court alleged that Ralph had committed the crime of attempted murder. The state moved for remand of the child to adult court.

Ralph is a Mexican-American born October 6, 1957 in Los Angeles, California. He is the second youngest child in a family of 11 children, and lived with his parents until summer 1973 in Pomona. He completed the ninth grade but could not read or write, and dropped out in 1972. He dropped out, he said, because "[t]hey didn't teach nothing in that school." His mother indicated in her testimony that the reason for dropping out related to the fact that he commenced at about the same time to live with a girl as his wife.

The parents are unemployed, and his father is disabled. During the summer of 1973, Ralph and his brother Henry, age 23, left Pomona. Henry's wife, Consuelo, and Ralph's girlfriend, Delores, whom he referred to as his "wife," accompanied them.

They ended up in Portland where they lived two months, working on a day-to-day basis. They then

went to the Chicano Indian Study Center of Oregon (CISCO) at Camp Adair in Benton County. Ralph had been enrolled in a carpentry course there for two or three weeks when the alleged incident occurred.

According to testimony at the hearing, Ralph had been living with his girlfriend in an apartment at Camp Adair. They occupied one bedroom, and shared the apartment with two other Mexican-Americans and the alleged victim, a Caucasian, and his 18-month-old son. Henry and his wife lived in another apartment in the same building.

On November 5, 1973, Henry and the victim, Steven Berrigan, got into a fight. A detective quoted Berrigan as saying that he did not want to fight, but that Henry forced him. He had gotten Henry on the ground and was attempting to restrain him when Ralph ran up behind him and stabbed him twice in the back with a hunting knife. He said that Ralph then placed the knife to his throat and said, " 'Stevie, I'm going to kill you,' " and stabbed him heavily in the back a third time. He said that he was then placed, in a weakened condition, in one of the buildings, and then finally was driven to Corvallis to a hospital.

According to Berrigan, he had to promise to go along with a story designed to keep Ralph out of trouble before he was taken to the hospital. Later, when Berrigan's child was retrieved and safe, Berrigan told the detective a different and allegedly true story, which resulted in Ralph's apprehension in and return from Arizona, where he and his party had fled.

The hearing in the juvenile department was held solely to determine whether, as required by ORS 419.533, it was in the best interests of the child and

the public to have Ralph remanded to adult court. For the purpose of the hearing, the hearsay was admitted and deemed true. Ralph was asked no questions concerning the crime itself.

ORS 419.533 states:

"(1) A child may be remanded to a circuit * * * court of competent jurisdiction for disposition as an adult if:

"(a) The child is at the time of the remand 16 years of age or older; and

"(b) The child committed or is alleged to have committed a criminal offense * * * and

"(c) The juvenile court determines that retaining jurisdiction will not serve the best interests of the child and the public.

"* * * * *"

The only issue in this appeal is whether, under ORS 419.533, the juvenile court was correct in remanding Ralph to adult court. Under ORS 419.561 (4), this court has de novo review of the record. See extended discussion of the scope of this review, and the weight to be accorded the trial court's findings, in *State ex rel Juv. Dept. v. Slack,* 17 Or App 57, 60-2, 520 P2d 905, Sup Ct *review denied* (1974).

Juvenile counselor Krug in support of the state's motion testified:

"A * * * The criteria we are using is the seriousness of the offense. The facts, at least according to what information we have, the act was committed aggressively and in a willful manner. It was an act against a person, not against property. Also, the fact, from what source of information we have, would consider him an emancipated juvenile. Emancipated in the sense he is not in school, he is not living with his parents, he has been living with a woman that he states is his wife

for over a year. He left the residence of his parents in California six months ago. Those are the kinds of things we consider in supporting your motion.

"Q Do you believe that the juvenile process has anything to offer Ralph?

"A Yes, I do. I think that because Ralph has turned 16 that the juvenile process could offer a number of things. We have a 16 year-old boy that finished the 9th grade that can't read and can't write. I think he has a difficult time understanding adult conversation. Certainly, Juvenile could put the boy back into school alternative educational system. They could provide vocational training of some kind with some kind of work experience on a part-time basis. They could offer counseling and other supportative services. I think the system would be effective, yes.

"Q Are you aware that in the adult corrections process the same education would be available to Ralph?

"A Yes, I am aware of that.

"* * * * *

"Q * * * [Y]ou still abide by your feeling that remand is proper in this case, is that correct?

"A Yes, I do.

"Q And that is basically because of the seriousness of the crime and for the protection of the community, is that it?

"A Yes, I would agree with that."

But on cross-examination Mr. Krug testified that he had only brief contact with Ralph before his initial reactions were formed. It came out that Ralph is 5' 4" tall and weighs about 110 pounds, that initial and considered opinion was that he is immature, and that he has had no previous record of violence. Mr. Krug testified:

"I have an opinion and I have a lot of reserva-

tions with that opinion. My own opinion is that I am not sure he would be a threat to the community. With what information I have from the police reports and the circumstances at the time, would indicate possibly this alleged offense could have been a one time thing and would not occur again. Although I do have reservations—I don't have all the information and I have had limited contact with Ralph * * *."

Mr. Krug also testified that Ralph did not appear to have sufficient maturity to exercise the vote, to drink beer or to play cards with friends. He felt that Ralph could not handle these situations.

Mr. Moody, director of the juvenile departments for Linn and Benton Counties, testified that he thought Ralph would fare poorly in an adult correctional institution, then:

"Q By, 'faring poorly', what kinds of considerations are running through your mind?

"A He could become the target of homosexual assaults and could be made practically a slave of the larger more aggressive parties.

"Q Are you aware of this kind of conduct taking place at O.S.C.I.?

"A I have reason to have conclusions as that being a real problem. I am also aware of the same thing taking place at MacLaren School [juvenile institution]."

Mr. Moody then indicated that the subject's own aggressiveness would be a major factor in determining whether he would be victimized in any institution.

Considering the circumstances surrounding the incident, that the alleged victim had Ralph's brother on the ground, which Ralph undoubtedly construed as threatening to his brother, and considering all other things, we are inclined to think that, regardless of the

viciousness of the attack, it was a "one time thing." We also consider Ralph's previous lack of contact with authorities, and his mother's testimony that he had been a good-natured and jovial child, one of the babies of the family. Her testimony is obviously prejudiced toward Ralph but it is some indication of a characteristic good nature on his part.

The record supports a conclusion that Ralph is physically, emotionally and mentally immature for his age. There is definite potential for rehabilitation. In the adult prison system, he would be substantially more vulnerable to physical and sexual assaults due to his size and immaturity. We conclude that Ralph's and the public's interests would be best served by retaining him within the juvenile court system.

Reversed and remanded.