537 P.2d 148 (1975)
In the matter of Rickey Dale MATHIS, a Child.
State ex rel. Juvenile Department of Douglas County, Respondent,
v.
Rickey Dale Mathis, a Child, Appellant.
Court of Appeals of Oregon.
Argued and Submitted May 20, 1975.
Decided June 23, 1975.
Bruce Tower, Public Defender, Roseburg, argued the cause and filed the brief for appellant.
Scott McAlister, Asst. Atty. Gen., Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Atty. Gen., and W. Michael Gillette, Sol. Gen., Salem.
Before SCHWAB, C.J., and LANGTRY and FORT, JJ.
LANGTRY, Judge.
This is a proceeding in which the district attorney of Douglas County moved that Mathis, age 16, be remanded to adult court. Mathis was then the subject of a juvenile court petition because of an alleged murder and robbery committed by him. The juvenile court ordered the remand and the juvenile appeals.
We can make no better a summary statement of the evidence than that in the following excerpts from the trial judge's findings with only one exception which will be noted later:
"Rickey Dale Mathis is 16 years of age. His birthdate was August 21, 1958. It is to be assumed as a fact Mathis committed the acts charged. (State v. Zauner, 250 Or. 101, 441 P.2d 83 (1968). These assumed facts would therefore be that decedent persuaded Mathis to engage in sexual perversity, in the midst of which Mathis set upon decedent stabbing him a number of times, attempting to beat him with a small hammer, and beating him with a skillet or frying pan, causing decedent's death. Mathis is also alleged to have robbed decedent of money and property (a car).
"* * *
"* * * Mathis has had, from the beginning of formal schooling, a continuing inability to progress in school in what shall be arbitrarily denominated a normal manner. His principal problem appears to be an inability to master reading, and perhaps spelling * * *.
"Mathis has had many advantages. It appears material needs (and at least all reasonable wants) have been more than adequately provided. On the other hand, he is the last of four children in a household wherein the parents and the other three children apparently succeeded easily in the areas he finds troublesome.

*149 "Mathis has not previously been referred to juvenile authorities. He has, however, experimented with some drugs, has drank [sic] alcoholics, he smokes, and uses profane and obscene language. He has on numerous occasions been a truant and a school discipline problem. He has been suspended and was transferred from a `progressive' school setting to a `more conventional' school. He has twice been a runaway, the last time ending in the present charge.
"Mathis' problems at schools caused him to be transferred as mentioned and also to be referred for psychiatric help. He received evaluation and treatment by counseling on a weekly basis for about seven or eight months immediately prior to the offense alleged. This psychiatric therapy was given by an experienced doctor who appears to be eminently qualified in his field. The immediate and actual cause of the last runaway is not apparent. Another psychiatrist, engaged on behalf of Mathis, found him not to be mentally ill; however, found, in addition to the aforementioned school problems, that Mathis had a progressive history of temper tantrums, depressions, runaway, truancy, lying, swearing and resistance to authority.
"Paradoxically, Mathis was an active Boy Scout, excelling in achievement and scouting ability * * *.
"* * *
"Mathis has been an exemplary inmate during his confinement in detention. He is reported to have acted with maturity in matters involving custodial problems of other juvenile inmates with whom he has been associated during his confinement. He has been detained in jail areas reserved for juveniles. There is no evidence of association with adult jail inmates.
"Both psychiatrists who testified estimate Mathis will need counseling for three or four years.
"Testimony has been received from Mathis' parents, treating psychiatrist, teachers and other associates. Most of these witnesses favor retention of juvenile court jurisdiction. * * * [I]t appears the fact, that if kept in juvenile court jurisdiction and wardship established, commitment to State Children's Services Division (MacLaren) is, without doubt, the only available and appropriate placement."
The trial judge concluded:
"In the opinion of the court, the motion to remand should and must be granted. The movant's evidence was that which supports the offenses alleged. Almost all other witnesses favored retention of juvenile court jurisdiction * * *.
"It is urged on Mathis' behalf that he has not previously been adjudicated delinquent nor received the services available though [sic] counseling. His behavior pattern, however, is a familiar one. It seems most unlikely that any lack of prior juvenile court counseling service is of any persuasive significance in view of the extended efforts by schools to assist him, as well as the weekly psychiatric counseling he received over at least a seven months['] period of time. In this regard, Mathis' reaction to `crisis' (the truth of the charge being assumed) was of a kind and character weighing against retention of jevenile [sic] jurisdiction.
"Mathis is at the threshhold [sic] of maturity. He was a juvenile heretofore; he will not be hereafter. He would, if retained in juvenile court, enter the only facility available to him above the average age of other inmates. From the testimony, it is unlikely he would be retained beyond his 19th year, or, any more than three years. A longer period for any re-adjustment as well as a subsequent period of continued supervision seems clearly indicated. The public's interest cannot be otherwise reasonably recognized. On the other hand, he *150 would, if convicted and sentenced to incarceration in adult court, enter an institution at the lowest age level. The former consideration outweighs the latter.
"There are other considerations. The factual circumstances which would be relied upon for conviction involve the decedent's reputation. Moreover, the offense chargeable carries lesser included offenses so that mens rea, that is, state of mind is very significant. Indeed, one of the possible alternative results of proceedings in adult court is exoneration.

"For all the foregoing reasons, the court is of the opinion that the best interests of Mathis and the public can be most properly served by granting the motion to remand." (Emphasis supplied.)
Mr. Graham, a program director at MacLaren School for Boys, testified. He supervises about one-third of the boys committed to that institution. He stated that he had four students in his unit who were there because of homicides they had committed. One of them had been "administratively transferred" from Oregon Correctional Institution to MacLaren. Thus, it appears that for a situation like we have at bar, where the juvenile at first may need the type of juvenile care that MacLaren affords, but will outgrow it and may still need more institutional care, and undoubtedly more years of supervision of parole nature if not institutional care, the methods exist for meeting these various needs.
But the variety of the methods are only possible if the juvenile's case is tried in adult court with resultant commitment to the Corrections Division. See ORS 179.473, 179.476(3) and (4), and 420.011.[1] Perhaps, as the trial will result in exoneration. But if it does not, the juvenile can be served with his age group peers while *151 still a juvenile if the facts justify it, and with the public still protected by his further confinement or supervision after juvenile age if the facts then justify that approach.
The trial judge thoroughly considered the legal alternatives, the alleged crime and the particulars relating to this juvenile, his welfare and public protection.
We have considered the dissenting opinion and recognize that it takes the opposite side in a close case. However, we feel that it incorrectly views some of the facts surrounding the killing. A tape recording of the boy's confession was heard by the court. It is not in the record we have reviewed. However, Officer Winningham reviewed in his testimony what the boy told him (and presumably it is identical with the taped confession). The boy did not testify. There were no other witnesses to the event. There was nothing in the officer's testimony or any other testimony we have reviewed about the boy's mounting the victim's back. The prosecutor in his opening statement said the stabbing was done with the boy's knife, and this statement was not challenged. There is nothing in Officer Winningham's testimony or any other testimony we have reviewed about a "switchblade knife extending from the victim's trouser pocket." Rather, the officer said the boy told him that, when he returned with the oil to the room where the victim was, both were naked, the victim lying face down on the bed,
"* * * he glanced down and he saw his pocketknife out of the  partially out of his pocket of his trousers that were lying on the floor. He said that he decided that he didn't want to go through with this, that he reached down very carefully and quietly, that he depressed the button on the side of the knife and opened the knife and subsequently started stabbing * * *.
"* * *
"* * * [B]y depressing the button he said it was quiet so Mr. * * * wouldn't hear anything. He held the button down so there was no click."
From this, we infer that the boy carried a springblade knife, and that under the stress of the situation, and desiring to acquire the victim's money, in a cool and calculated manner he proceeded with the assault.
The trial judge's decision is well buttressed with reason and we agree with it.
Affirmed.
FORT, Judge (dissenting).
This case presents the always difficult problem of whether a child should be remanded for trial as an adult. The alleged crime was committed four days after his 16th birthday.
As the majority points out, this boy, not yet in high school, had never previously been referred to a juvenile court. His school difficulties were not of major dimensions and in the six months prior to the crime charged they had greatly improved, as a result of a change in schools combined with weekly treatment by a fully qualified child psychiatrist. Nothing in his prior history remotely hints at violent tendencies.
In State ex rel. Juv. Dept. v. Cardiel, 18 Or. App. 49, 523 P.2d 1057 (1974), we considered a somewhat similar case involving a 16-year-old boy. There the boy was slightly older than Rickey Mathis, was for all practical purposes emancipated, and indeed was living with a girl whom he referred to as his wife, had been regularly employed, and at the time the offense occurred was enrolled in the Chicano Indian Study Center in a carpentry course. He had long been a school dropout. The charge there was attempted murder involving the repeated stabbing in the back of a man who was successfully resisting an effort by Cardiel's older brother to defeat him in a weaponless fight.
*152 Unlike the case at bar, the victim did not die. In reversing the trial court, this court said:
"Considering the circumstances surrounding the incident, that the alleged victim had Ralph's [appellant's] brother on the ground, which Ralph undoubtedly construed as threatening to his brother, and considering all other things, we are inclined to think that, regardless of the viciousness of the attack, it was a `one time thing.' We also consider Ralph's previous lack of contact with authorities, and his mother's testimony that he had been a good-natured and jovial child, one of the babies of the family. Her testimony is obviously prejudiced toward Ralph but it is some indication of a characteristic good nature on his part.
"The record supports a conclusion that Ralph is physically, emotionally and mentally immature for his age. There is definite potential for rehabilitation. In the adult prison system, he would be substantially more vulnerable to physical and sexual assaults due to his size and immaturity. We conclude that Ralph's and the public's interests would be best served by retaining him within the juvenile court system." 18 Or. App. at ___, 523 P.2d at 1059.
Here, this boy, four days past his 16th birthday, had run away from home on what was generally described as a vacation during the summertime. He was enticed into a homosexual situation by a man approximately 40 years of age at the latter's summer mountain cabin and paid $40, ostensibly to perform one and one-half hours' work. While the boy was so engaged, the man induced him to engage in oral sodomy and then sought to persuade him to perform an act of anal sodomy on him. After being sent from the man's bedroom to get some lubricating oil he returned to the bedroom, found the man lying naked, face down on the bed, his clothes still in a heap on the floor. When the boy mounted his back he saw on the floor a switchblade knife extending from the victim's trouser pocket. He reached over, having determined that he would not go through with the demanded act and, apparently repelled by the situation, picked up the knife and quietly opened it, and instead of proceeding to carry out the act of anal sodomy he stabbed the victim repeatedly in the back and, as he turned over, again in the chest. When the victim did not die the boy obtained a heavy frying pan and hammer and beat him over the head, fracturing his skull. After leaving the mountain cabin he later returned, took the man's wallet and car keys and fled in his car. In contrast to the Cardiel case where the boy fled the state and had to be returned from Arizona, this boy, even before leaving the mountain forest area, contacted officials and reported what he had done.
Here, the boy was still in school, although he had had a record of truancy and suspension for smoking prior to the school transfer above referred to.
Nothing in this record indicates any prior involvement whatever of a homosexual nature in the boy's life, nor any indication of violence. Like Cardiel, this, too, was clearly "a one time thing." Both psychiatrists who testified in this case, the juvenile department personnel, and representatives of the State Training School agreed that this boy was a better candidate for rehabilitation in the juvenile system than in the adult. The two psychiatrists estimated a maximum period of three to four years as necessary to his rehabilitation.
Unlike Cardiel, this boy comes from a strong family background. His mother is and has been a school teacher for many years, holding a Master's Degree. His father, a college graduate, is a highly successful engineer and has worked for more than 20 years in a responsible position for a major corporation. His older sister is a registered nurse. One of his two older brothers is a college graduate and the other is now attending college. Thus, unlike Cardiel, where the boy was completely emancipated and had no family strengths, this boy's family offers unusual strengths *153 to aid in his rehabilitation. Here the trial court concluded that because of the viciousness of the crime it was unlikely that this boy could be rehabilitated before he is 21. No trained professional in either the social work, correctional or medical fields expressed such an opinion. Nor did anyone recommend that this boy should be remanded to the adult court or committed to an adult institution, or that either would be in the best interest of the public or of the boy.
From my examination of this record I conclude that the state has failed to establish, whether one applies the rule of preponderance of the evidence, clear and convincing evidence or proof beyond a reasonable doubt,[1] that it is in the best interests either of the public or of this child that he be remanded to adult court, let alone both of them, as ORS 419.533(1)(c) requires.
Accordingly, I respectfully dissent.
NOTES
[1] ORS 179.473 provides:

"(1) Notwithstanding any other provision of law, whenever the welfare of the person transferred and the efficient administration of the institutions require the transfer, subject to ORS 179.476:
"* * *
"(b) * * * [A] division may make a permanent or nonpermanent transfer of a person from any institution under the jurisdiction of that division to any other institution under the jurisdiction of that same division.
"(2) A student of a juvenile training school may not be transferred to the Oregon State Penitentiary under subsection (1) of this section. A student of a juvenile training school who has been transferred to another institution may not be transferred from such other institution to the Oregon State Penitentiary.
"(3) A student of a juvenile training school may not be transferred to another institution under the supervision of the Corrections Division unless all of the following conditions are met:
"(a) The student is 16 years of age or older.
"(b) The behavior of the student at the training school is such as to endanger his own welfare or the welfare of others.
"(c) The student continues to receive, at the institution to which he is transferred, training of a type and degree at least as well suited for juveniles as that prescribed by ORS 420.120 or 420.320.
"(d) The consent of the committing court has been obtained after a hearing pursuant to ORS 419.498 [due process juvenile court hearing]."
ORS 179.476(3) and (4) provide:
"(3) An inmate who has been transferred from one of the institutions may be retransferred to that institution or, pursuant to ORS 179.473, to any other institution listed in ORS 179.321 [does not include juvenile training schools].
"(4) The duration of a transfer from a juvenile training school may not exceed the period of the original commitment. Any such individual must, prior to his release, be returned to the juvenile training school for release."
ORS 420.011 provides:
"(1) * * * [A]dmissions to the juvenile training schools are limited to persons between the ages of 12 and 18 years * * *. No child admitted to a juvenile training school shall be transferred by administrative process to any penal or correctional institution.
"(2) * * * [P]ersons under the age of 21 years who are committed to the custody of the Corrections Division [includes OCI] under ORS 137.124 may be assigned to a juvenile training school by the Corrections Division."
[1] The standard of proof required to support an order of remand remains today unclear. ORS 419.500(1) requires proof beyond a reasonable doubt "in the adjudicative phase of a hearing where a finding of jurisdiction may result in institutionalization," but otherwise "by a preponderance of * * * [the] evidence." Its 1971 amendment (Oregon Laws 1971, ch. 31, § 1, p. 44) doubtless reflected the mandate of McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). ORS 419.533(1)(c) provides only that a remand may be ordered if "the juvenile court determines that retaining jurisdiction will not serve the best interests of the child and the public." (Emphasis supplied.)

Neither Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), nor In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), at the federal level, nor State v. Little, 241 Or. 557, 407 P.2d 627 (1965), cert. denied 385 U.S. 902, 17 L.Ed.2d 133 (1966), State v. Zauner, 250 Or. 105, 441 P.2d 85 (1968), nor Bouge v. Reed, 254 Or. 418, 459 P.2d 869 (1969), in our Supreme Court, have dealt with this question. On May 27, 1975, the United States Supreme Court in Breed v. Jones, ___ U.S. ___, 95 S.Ct. 1778, 44 L.Ed.2d 346, a case dealing primarily with double jeopardy in relation to juvenile remand proceedings, said:
"* * * In Kent v. United States, 383 U.S., at 562, 86 S.Ct. [1045], at 1057, the Court held that hearings under the statute there involved `must measure up to the essentials of due process and fair treatment.' However, the Court has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court. We require only that, whatover the relevant criteria and whatever the evidence demanded, a State determine whether it wants to treat a juvenile within the juvenile court system before entering upon a proceeding that may result in an adjudication that he has violated a criminal law and in a substantial deprivation of liberty, rather than subject him to the expense, delay, strain and embarrassment of two such proceedings." (Emphasis supplied, footnote omitted.) ___ U.S. at ___, 95 S.Ct. at 1790.
Breed in short reiterates the need for "fundamental fairness" earlier required in Kent, Gault and McKeiver, but declines to fill in the interstices between the intersections of that reticulated creation. Our own recent decisions shed no light on this question. See: State v. Weidner, 6 Or. App. 317, 484 P.2d 844, 487 P.2d 1385 (1971); State ex rel. Juv. Dept. v. Slack, 17 Or. App. 57, 520 P.2d 905, S.Ct. review denied (1974); State ex rel. Juv. Dept. v. Cardiel, 18 Or. App. 49, 523 P.2d 1057 (1974). Since, however, appellant here in his brief asserts only that the state failed to establish its case by a preponderance of the evidence, it is not necessary to reach the question here.