391 A.2d 1385 (1978)
In the Matter of A. S. W., Appellant.
In the Matter of J. A. M., Appellant.
No. 11646, 11723.
District of Columbia Court of Appeals.
Argued March 16, 1978.
Decided September 20, 1978.
*1386 Ross T. Dicker, Washington, D. C., appointed by this court, for appellant in No. 11646.
David J. Ontell, Washington, D. C., appointed by this court, for appellant in No. 11723.
Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D. C., at the time this case was briefed and argued, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellee.
Before KELLY, NEBEKER and FERREN, Associate Judges.
FERREN, Associate Judge:
This case presents the question whether residents of the District of Columbia's Cedar Knoll Children's Center, located in Laurel, Maryland, who are charged with assaulting counselors on the premises, D.C. Code 1973, § 22-505(a), are subject to the jurisdiction of the Superior Court, Family Division; or whether instead, as appellants claim, such juveniles have a constitutional right to a proceeding in the state where the offenses took place  Maryland. We reject appellants' contention, hold that the Superior Court does not have jurisdiction, and affirm the adjudications of appellants' delinquency.

I.
On July 4, 1976, the Cedar Knoll Children's Center suffered an electrical failure resulting in a shutoff of lights and air conditioning and a consequent use of candles. Aided by this fortuity, the residents of "B Side" of the Lincoln Cottage planned an uprising, possibly an escape. Sometime around 11:00 p. m. they extinguished the candles.
*1387 One of the Counselors, Sherman Coston, Jr., investigated. When he entered the dormitory, however, someone tossed a sheet over his head, assaulted him, and wrestled him onto a bed. As he struggled, he called for the help of fellow counselor, David Whitmyer, who was locking "A Side" of the cottage. Mr. Whitmyer responded, but as he entered the locker room area someone knocked his candle from his hand and pushed him into the dormitory. There, he saw Mr. Coston on a bed, bloody and battered. Mr. Whitmyer testified that when he asked for an explanation, F.H.S., a resident of the cottage, informed him that they were "getting out" and asked for the keys. He further testified that he was struck during the episode but that he could not identify his assailant.
Not long after Mr. Whitmyer's entrance, Mr. Coston was escorted to a seclusion room where he was locked up; Mr. Whitmyer was carried to the shower and confined there. Apparently, other authorities soon quelled the disturbance, freed the counselors, and began an investigation. As a result, several juveniles, including 16-year-old A.S.W. and 17-year-old J.A.M., were charged in Family Division petitions alleging "need of care and rehabilitation." Specifically, they were each charged with two counts of assault, D.C.Code 1973, § 22-505(a), and one count of conspiracy to assault, id.; D.C.Code 1973, § 22-105a(a).[1]
A factfinding hearing began in the Family Division on October 2, 1976.[2] F.H.S., a Lincoln Cottage resident who also had been charged in connection with the incident, testified for the government after receiving a promise to dismiss the petition against him. F.H.S. connected both appellants to both assaults. Primarily on the strength of his testimony, supplemented by the accounts of the two counselors (although their testimony contained little direct evidence of appellants' involvement), the government obtained findings of guilt on both counts and delinquency adjudications as to each appellant.[3] On December 7, 1976, both A.S.W. and J.A.M. were committed to the Social Rehabilitation Administration for indeterminate periods not to exceed two years.

II.
Appellants argue that they have a constitutional right to a factfinding hearing in Maryland. Art. III, § 2, cl. iii of the United States Constitution provides: "The trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed." The Sixth Amendment adds: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . .[4] Juvenile proceedings, however, are not criminal trials or prosecutions, McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); In re J. T., D.C.App., 290 A.2d 821, cert. denied, 409 U.S. 986, 93 S.Ct. 339, 34 L.Ed.2d 252 (1972). *1388 Thus, art. III and the Sixth Amendment do not apply here.[5]
The Fifth Amendment, however, entitles juveniles to due process. McKeiver, supra. This suggests the possibility that the site of a factfinding hearing may be restricted by a constitutional guarantee similar, if not identical, to the guarantee in art. III and the Sixth Amendment. According to the Supreme Court, "the applicable due process standard in juvenile proceedings. . . is fundamental fairness," with an emphasis on assuring factfinding procedures which are "accurate." McKeiver, supra, 403 U.S. at 543, 91 S.Ct. 1976. In order to determine whether appellants, therefore, are entitled to a hearing in Maryland as a matter of fundamental fairness, we should examine, for guidance, the purposes of art. III, § 2, cl. iii and the Sixth Amendment and the probable impact if these constitutional guarantees were  and were not  applicable to juvenile proceedings.
The Supreme Court has noted that "[t]he provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." United States v. Cores, 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873 (1958). We agree with appellants that this constitutional "venue" limitation was intended, more specifically, to assure the availability of witnesses and other evidence and of the solace of family and friends of the accused, as well as to prevent unnecessary hostility from a distant community and the financial burden of a remote trial. See id. at 407, 78 S.Ct. 875; United States v. Johnson, 323 U.S. 273, 275, 65 S.Ct. 249, 89 L.Ed. 236 (1944).[6] In applying these considerations to the circumstances of this case, we conclude that fundamental fairness does not dictate a Maryland hearing (conducted by Maryland authorities under Maryland law).
We focus initially on the critical element of fundamental fairness for juveniles, accuracy of factfinding, see McKeiver, supra, and thus on the question whether a Maryland proceeding would increase the availability of witnesses and other evidence. We are considering offenses committed upon employees of a District of Columbia institution by juveniles who reside there. All witnesses were found within the same institutional enclave, under District of Columbia control, and thus were easily produced for the hearing. The Cedar Knoll facility is located but a few miles away from the District. Accordingly, there is no reason to believe that a Maryland hearing would increase the prospects for accurate factfinding.
The other factors underlying the art. III and Sixth Amendment site-of-hearing limitations do not bear as directly on accuracy of factfinding, which appears to be the key to the fundamental fairness inquiry. See McKeiver, supra. But even if they did, these factors do not enhance appellants' argument. We do not perceive that a Maryland hearing would be likely to produce less community hostility or more support from family and friends for a juvenile accused of an offense in a District facility. As to juveniles who are residents of the District, these factors presumably would cut in favor of a District of Columbia hearing.[7] Community hostility, in any event, may have little, if any, relevance because of the nonpublic and nonjury nature of juvenile proceedings; but to the extent that an offense itself were to become public in a way that threatened a fair proceeding, it would be just as likely for hostility to surface in Maryland against offenders from a foreign enclave as it would be for hometown *1389 hostility to affect the District of Columbia proceedings.[8]
Nor, finally, does it appear that a District of Columbia hearing for Cedar Knoll offenses would impose on appellants  or on other juveniles similarly situated  a greater financial burden than a Maryland hearing would. To the contrary, in fact, it is not clear that the District of Columbia plan for furnishing legal representation to indigents in criminal and juvenile cases would extend to proceedings in Maryland, see D.C. Code 1978 Supp., § 11-2601; nor is there evidence of record that Maryland provides as extensive a program for legal representation to indigent juveniles (including investigative, expert, and other services) as the District of Columbia does. See D.C.Code 1978 Supp. §§ 11-2601 to -2608. The record shows that counsel for appellants were appointed and paid for under the District plan. Thus, at least as to indigent juveniles at Cedar Knoll, including appellants, a District of Columbia hearing would not appear to suggest a financial disadvantage.
We do not categorically exclude the possibility that a juvenile hearing in the District of Columbia could be fundamentally unfair, and thus a violation of due process, when the offense underlying the delinquency petition was committed in another jurisdiction. We do hold, however, that in these cases of assault by residents of a District juvenile detention facility, located in Maryland, due process does not require a Maryland hearing conducted by Maryland officials under Maryland law and procedures. The ample guarantees of the District's juvenile system, see In re J. T., supra at 825-26, assure fundamental fairness that would not be enhanced by requiring that the hearing take place in the state where the facility is located and the offenses were committed.

III.
Appellants also maintain that the statutory jurisdiction of the Family Division of the Superior Court does not extend to delinquency hearings premised on violations of D.C.Code 1973, § 22-505(a).[9]
In making this argument, appellants first refer to D.C.Code 1973, § 11-923(b)(1), expressly limiting the Criminal Division's jurisdiction to "any criminal case under any law applicable exclusively to the District of Columbia." They note that we have interpreted § 11-923(b)(1) to limit Criminal Division jurisdiction to violations within the boundaries of the District. See United States v. Thompson, D.C.App., 347 A.2d 581 (1975); Rivers v. United States, D.C.App., 334 A.2d 179 (1975); Hubbell v. United States, D.C.App., 289 A.2d 879 (1972). It follows, according to appellants, that because delinquency adjudications presuppose commission of criminal acts, jurisdiction of the Family Division must be subject to the *1390 same geographical limitation as that of the Criminal Division.
This argument is flawed because the statutory provisions governing Criminal Division jurisdiction do not apply. D.C.Code 1973, § 11-1101 governs Family Division jurisdiction. That section not only lacks the language of § 11-923(b)(1) suggesting a geographical limitation but, to the contrary, includes language contemplating coverage of some acts outside the District of Columbia. Section 11-1101(13) grants the Family Division exclusive jurisdiction over "proceedings in which a child, as defined in section 16-2301, is alleged to be delinquent." D.C.Code 1973, § 16-2301(6), defines a delinquent child as one "who has committed a delinquent act and is in need of care or rehabilitation"; and D.C.Code 1973, § 16-2301(7), provides that a delinquent act is one "designated as an offense under the law of the District of Columbia, or of a State if the act occurred in a State, or under Federal law." See Darling, Youthful Offenders and Neglected Children Under the D.C. Crime Act, 20 Am.U.L.Rev. 373, 384-85 (1970-71). Thus, Congress, rather than exclude the possibility, appears to have intended that the Family Division have extraterritorial jurisdiction. The reasoning of Thompson, supra, Rivers, supra, and Hubbell, supra, as to the more restrictive jurisdictional provision governing the Criminal Division does not apply here.[10]
Appellants contend, next, that the provision of D.C.Code 1973, § 22-505(a), proscribing assaults on officers or employees of District juvenile facilities "located within the District of Columbia or elsewhere" was not intended to reach assaults outside the District. See note 9, supra. Their argument presupposes that the extraterritorial language of § 22-505(a) refers merely to a class of victims  officers or employees of a District juvenile facility wherever located  who are attacked within the District.
In Thompson, supra, where we upheld Superior Court jurisdiction over a § 22-505(a) charge of assaulting a police office within the District of Columbia, we pointed out that § 22-505(a) actually is composed of three separate laws prohibiting attacks on personnel of a police force, of a fire department, or of a penal, correctional, or juvenile facility. We specifically reserved the question whether attacks on correctional employees in adult and juvenile institutions outside the District (i. e., under the third law) were reachable under the extraterritorial provision of § 22-505(a). Thompson, supra, at 582 n. 2, 583-84.[11]
We now conclude, consistent with our own prior intimations as well as the views of the United States Court of Appeals for the Fourth Circuit in United States v. Perez, 488 F.2d 1057 (4th Cir. 1974), that Congress intended the language of § 22-505(a)  "whether such institution or facility is located within the District of Columbia or elsewhere"  to reach attacks on personnel of juvenile facilities taking place outside, as well as inside, the District. It would be a strained reading of the statute to conclude, with appellants, that § 22-505(a) extends only to personnel from District facilities (located, for example, in Maryland or Virginia) who happen to be within the District when the attack occurs. It is far more reasonable to infer that Congress was aware of the District's detention facilities outside its borders and thus fashioned the statute to reflect that reality.
Accordingly, because the charges underlying the delinquency petitions accused *1391 appellants of actions constituting criminal offenders under § 22-505(a), and thus delinquent acts under § 16-2301(7), we hold that the Family Division had jurisdiction.[12]

IV.
We conclude that the proceeding did not violate appellants' constitutional or statutory rights. We also have reviewed the record and conclude that a reasonable trier of fact could have found appellants involved beyond a reasonable doubt as principals or aiders and abettors. See Manago v. United States, D.C.App., 331 A.2d 335 (1975); Saunders v. United States, D.C. App., 317 A.2d 867 (1974).[13] Accordingly, appellants' adjudications of delinquency are affirmed.
So ordered.
NOTES
[1] The government dismissed the conspiracy counts after appellants filed motions to dismiss.
[2] Prior to taking evidence at the hearing, the court heard and denied motions to dismiss for lack of jurisdiction based on the same legal contentions now made on appeal.
[3] The court had rejected insufficient evidence claims raised by each appellant in motions for judgments of acquittal at the close of the government's case.
[4] The Sixth Amendment restored the common law "jury of the vicinage" concept omitted from art. III. See Williams v. Florida, 399 U.S. 78, 93 & n. 35, 94, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Thus, art. III and the Sixth Amendment are properly read together to define the limitation on site of trial and jury selection. See United States v. Cores, 356 U.S. 405, 407 & n. 3, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958); United States v. Johnson, 323 U.S. 273, 275, 65 S.Ct. 249, 89 L.Ed. 236 (1944). Contrary to appellants' claim, the art. III reference to "trial of all crimes" does not confer a broader right (including coverage of juvenile offenses) than the Sixth Amendment application to "all criminal prosecutions." See In re J. T., D.C.App., 290 A.2d 821, 822, cert. denied, 409 U.S. 986, 93 S.Ct. 339, 34 L.Ed.2d 252 (1972).
[5] McKeiver, supra, and In re J. T., supra, held that neither the Sixth Amendment nor the Due Process Clause of the Fifth or Fourteenth Amendments grants a right to a jury in a juvenile proceeding.
[6] The case law refers to the issue as one of "venue," not "jurisdiction," the term used by appellants. See United States v. Cores, supra at 407, 78 S.Ct. 875; United States v. Johnson, supra at 276, 65 S.Ct. 249.
[7] Appellant J.A.M. is a District of Columbia resident; appellant A.S.W. is a resident of Maryland.
[8] If Maryland hearings were to be required for juvenile offenses at Cedar Knoll, presumably Maryland's entire juvenile offender system would be invoked. Although considerations of comity might prevent a Maryland juvenile court from making dispositions requiring concurrent  or consecutive  involvement of Maryland's juvenile officials and facilities, we cannot be sure that a jurisdictional pull and tug over a particular offender would not unfold to his or her detriment. In this case we do not have an assertion of jurisdiction by both the District and Maryland; thus, we do not have to resolve such a conflict. On the other hand, we do not perceive it to be a part of due process  of fundamental fairness  to thrust the possibility of such conflict upon appellants here by turning them over to Maryland authorities.
[9] D.C.Code 1973, § 22-505(a) provides in relevant part:

(a) Whoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with any officer or member of any police force operating in the District of Columbia, or any officer or member of any fire department operating in the District of Columbia, or any officer or employee of any penal or correctional institution of the District of Columbia, or any officer or employee of the government of the District of Columbia charged with the supervision of juveniles being confined pursuant to law in any facility of the District of Columbia, whether such institution or facility is located within the District of Columbia or elsewhere, while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than five years or both.
[10] We have reviewed the legislative history of § 16-2301(7); it is silent as to the extraterritorial provision. In this connection, we note neither appellant has argued that if the District does have jurisdiction here, the court should apply the substantive law of Maryland rather than the District of Columbia.
[11] In Rivers, supra at 182 n. 7, we stated in dicta that "[t]he only parts of [§ 22-505(a)] which are intended to have extraterritorial effect are those relating to District of Columbia correctional employees in adult or juvenile institutions." The United States Circuit Court of Appeals for the Fourth Circuit has concluded that Congress intended § 22-505(a) to have an extraterritorial reach for this third category of offenses. United States v. Perez, 488 F.2d 1057 (4th Cir. 1974).
[12] Implicitly, appellants also argue that because there could be no Criminal Division jurisdiction over an adult who attacks a prison guard at, for example, the District correctional facility in Lorton, Virginia, see D.C.Code 1973, § 11-923; U.S.Const. art. III, § 2, cl. iii, and Sixth Amendment; United States v. Perez, supra, such an extraterritorial act is not a criminal offense under District law and, therefore, could not be a delinquent act. We disagree, for this argument, confuses a substantive offense with jurisdiction. An act is delinquent if "designated" an offense under District law. D.C. Code 1973, § 16-2301(7); there is no additional requirement that the offense be subject to prosecution in the District of Columbia courts.
[13] We also reject appellant J.A.M.'s argument that venue is improper in the Superior Court even if it has subject matter jurisdiction. The comments to Super.Ct.Juv.R. 18-22 note that "all juvenile offenses in the jurisdiction of the Superior Court will be tried in that court."