### In the Matter of the WELFARE OF J.M.G.

### No. C8–84–899.

Court of Appeals of Minnesota.

Jan. 8, 1985.

William R. Kennedy, Hennepin Cty. Public Defender, David Duffy, Asst. Public Defender, Minneapolis, for appellant father.

Thomas Johnson, Hennepin Co. Atty., Robert Gyurci, Asst. Co. Atty., Minneapolis, for Hennepin Cty. Bureau of Social Services.

Lynnel Jones, Minneapolis, for respondent Guardian Ad Litem.

Janet V. Worel, Plymouth, for respondent mother.

Wright S. Walling, Minneapolis, for respondents maternal grandparents.

Considered and decided by the court, en banc, POPOVICH, C.J., and PARKER, FOLEY, SEDGWICK, HUSPENI, FORSBERG and CRIPPEN, JJ., with oral argument waived.

## OPINION

HUSPENI, Judge.

This appeal is taken from a judgment finding J.M.G. dependent as to her father as defined by Minn.Stat. § 260.015, subd. 6(d) (1980). We vacate the adjudication of dependency and remand for further proceedings consistent with this opinion.

## FACTS

J.M.G. was born September 11, 1981. Her mother and father had come to Minnesota from Louisiana several months before her birth so that she could be born in a Minnesota hospital in which her mother had previously worked. The family planned to return to Louisiana soon after J.M.G.'s birth. While mother and child were still in the hospital after J.M.G.'s birth, an attending physician notified the Child Protection Unit of the Hennepin County Bureau of Social Services expressing concern regarding mother's psychotic history and father's bizarre behavior. No action was taken on that complaint. Mother and child left the hospital a few days after J.M.G.'s birth, and they, together with father, prepared to return to Louisiana.

While mother and J.M.G. were having lunch in downtown Minneapolis with J.M.G.'s maternal grandparents on September 25, 1981, mother became physically ill. She and J.M.G. were taken to a hospital. J.M.G. was removed from her mother's custody at the hospital. Father was given no opportunity to provide care for J.M.G. during mother's hospitalization. A Minneapolis police officer was summoned to the hospital and asked to place a police protection hold order on J.M.G. The officer did so, based upon statements made by a child protection worker at the hospital and by the mother's doctor. A petition for detention was filed on September 28, 1981, alleging the maternal grandparents called a child protection caseworker because they feared the father would come to the hospital to take J.M.G.

The petition further alleged that mother made the following statements regarding father to the police officer at the hospital:

(he) could not and does not want to care for this infant * * * and is delusional in as much [sic] as he believes he is a tennis pro * * * he believes his mother shot him through the head but he was able to go to work the next day; he is unemployed.

However, the officer testified at hearing on December 2, 1983, that she no longer recalled speaking to mother on September 25, 1981. The officer was certain she did not talk to father. The September 28, 1981, petition further alleged:

* * * mother's attending physician * * * does not believe that either parent is capable of caring for this infant at this time. * * * both mother and father were being evicted from their housing on * * * September 30, 1981 and plan to leave the state of Minnesota.

The allegations in the petition were denied by father.

A detention hearing pursuant to Minn. Stat. § 260.172 (1980) was held on October 1, 1981, to consider whether J.M.G. should continue to be held by authorities or returned to her parents. At that hearing, mother and father were unrepresented by counsel. No sworn testimony was taken. Mother and father informed the court of their plans to return to Louisiana and expressed their desire to have J.M.G. returned to them. The court recognized the parents' imminent plans to return to Louisiana and stated an intention to transfer the matter of J.M.G.'s custody to Louisiana. The court further stated that J.M.G. would be brought to Louisiana independently and the family would be reunited there.

A continued hearing was scheduled for October 13, 1981. The parents were told an attorney would be appointed for them in Minneapolis, that they need not attend the October 13, 1981, hearing, and that upon their arrival in Louisiana they should contact a child protection worker in Minneapolis or the proper authorities in Louisiana. The county attorney assured the parents that "an attorney will be appointed here in Minneapolis to look out after your interest here in Minneapolis." Counsel was appointed for mother and father at the close of the October 1, 1981, hearing.

Contact with mother and father, who had returned to Louisiana, was lost for several months. The October 13 hearing was continued and notice of a dependency hearing for December 18, 1981, was made by publi-

cation. A foster placement plan for J.M.G. and notification of the December 18, 1981, hearing were mailed to the Louisiana home of father's mother. Mother and father did not respond. At the December 18 hearing, an attorney appeared on behalf of mother and father, who were not present. The attorney representing Hennepin County stated that a finding of neglect or dependency was not needed "at this time; however, we would state to the court that we would come back to this court at the end of 90 days and ask for a finding of dependency if we've had no progress." An adjudication of dependency was never made as a result of the December 18, 1981, hearing.

Mother returned to Minnesota in February 1982. Father returned in May 1982. A dispositional review hearing was held on May 14, 1982. All parties were present. Everyone, including the court, apparently believed an adjudication of dependency had been made on the October 9, 1981, petition. Eight goals for the parents were established on May 14.[1] The parents acquiesced, at least in part, to those goals. The parents' attorney urged that the goal of psychological evaluation should first be met and then a determination made as to whether additional goals were appropriate. All parties agreed that all goals would be met in Louisiana. Father and mother returned to Louisiana, and separated in August 1982. Father returned to Minnesota in September 1982 and visited with J.M.G. under supervision.

At a February 8, 1983, hearing, the original dependency and neglect petition, as amended, was dismissed and a new petition dated December 6, 1982, substituted therefor. The December 6 petition cites the eight goals, alleges that father was arrested on August 7, 1982, for assault on moth-

er, posted bail and was released; was visiting with J.M.G. in Minneapolis every other week; and that a social worker who brought J.M.G. to the government center for visitation was followed, at father's behest, in order to try to determine where the child was residing. The petition further alleged that father had indicated his intention to abduct the child from the foster home; that he would do anything to get J.M.G. back, including violence; and that father had completed a psychological evaluation but refused to sign a release of information.

Hearings on the December 6, 1982, petition were held on May 25, May 26, May 27, September 15, September 16, and December 3, 1983, and January 5, 1984. J.M.G. was adjudged dependent as to her mother on September 22, 1983. The hearing as to father continued. J.M.G. was declared dependent as to her father on April 20, 1984. Only father appeals. The marriage has been dissolved and mother has remarried.

## ISSUES

1. Whether alleged procedural defects of the October 1, 1981, hold hearing invalidate the ultimate adjudication of dependency as to father?

2. Whether failure to meet the goals set May 14, 1982, was a proper basis for adjudication of dependency?

3. Whether the adjudication of dependency is supported by the evidence?

## ANALYSIS

1.

Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequent-

---

1. Those goals required:
   1. That the parents, upon their return to * * Louisiana, notify their attorney * * * of their location and permanent address.
   2. That the parents * * * obtain permanent and stable living arrangements.
   3. That the parents contact * * * welfare authorities in * * * Louisiana and arrange for a psychological evaluation.
   * * * * * *

5. That the parents cooperate with * * * local welfare authorities in * * * Louisiana with reference to an evaluation of their parenting ability * * * and also address the availability of possible foster care for (J.M.G.).
6. That prior to the (Juvenile Court) approving the transfer of the child to * * * Louisiana, a favorable report will have to be received from the welfare authorities (in) Louisiana.

ly a poor substitute for principle and procedure. \* \* \* Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy.

*Application of Gault*, 387 U.S. 1, 18–20, 87 S.Ct. 1428, 1438–1439, 18 L.Ed.2d 527 (1967).

■ Father argues the October 1, 1981, hold hearing was procedurally defective because he was not represented by counsel, was unable to cross-examine those whose statements formed the basis of the emergency hold order, and did not understand the purpose of the hearing. We agree. Close scrutiny of the sparse October 1, 1981, record reveals the parents' querulous and anxious posture regarding why their daughter was taken from them, their plans to leave almost immediately to return to their former state of residence, Louisiana, and their desire and expectation that J.M.G. would accompany them. Balanced against this understandable attitude of the parents was a petition for detention replete with hearsay allegations which could neither be substantiated nor refuted on October 1, 1981. Although mother and father were instructed to provide a Louisiana address to the proper authorities, they were also assured that they could return immediately to Louisiana, that an attorney would be appointed to look after their interests in Minnesota, and that J.M.G. would be reunited with them in Louisiana. The confusion of mother and father as to their responsibility for communication is understandable. Interestingly, father testified in 1983 that he believed at the October 1, 1981, hearing that the county attorney was, in fact, his counsel.

No testimony was taken at the October 1, 1981, hearing. Instead, continued detention of J.M.G. was based upon hearsay statements of father's conduct. Of special concern to this court is the fact that the police officer relied, at least in part, on the fears of maternal grandparents that the natural father, who had the full right to both physical and legal custody of his daughter, would take the child from the hospital.

In consideration of the particular circumstances present in this matter, the basis upon which the detention hold order was issued and verified, and the conduct of the October 1, 1981, hearing,[2] we agree with father's concerns regarding compliance with due process requirements. We conclude that the court erroneously exercised jurisdiction on October 1, 1981. In so concluding, we note the observations of the Michigan Supreme Court in *Buczkowski v. Buczkowski*, 351 Mich. 216, 88 N.W.2d 416 (1958):

> There is a wide difference between a want of jurisdiction in which case the court has no power to adjudicate at all, and a mistake in the exercise of undoubted jurisdiction in which case the action of the trial court is not void although it may be subject to direct attack on appeal. This fundamental distinction runs through all the cases.

*Id.* at 222, 88 N.W.2d at 419.

■ 2. Subsequent to the October 1, 1981, hearing, the court missed opportunities presented to it to correct the flawed procedures present there. We recognize that the difficulty in communicating with mother and father between October 1, 1981, and the early months of 1982 was not eased by their mobility during that period. (Testimony at the 1983 hearing indicated they moved three times during those months in an effort to find employment.) In any event, for reasons which this court cannot determine, all parties proceeded to a May 14, 1982, hearing under the mistaken belief that a default dependency adjudication had taken place between October 1,

---

**2.** While we do recognize that the court appointed an attorney for mother and father at the close of the October 1, 1981, hearing, we also recognize that statements made by the court and county attorney to the parents were so confusing as to dilute the effectiveness of the subsequent appointment.

1981, and May 14, 1982. As a result of the May 14, 1982, hearing, the court drew up eight goals. Of particular concern is the fact that those eight goals were imposed at a time when there still had not been one word of sworn testimony as to father's conduct or his parenting ability. Father argues the court had no jurisdiction to enter the May 14 order in the absence of an adjudication of dependency. *See* Minn. Stat. § 260.191 (1980).

We believe that the court's action in instituting the eight goals on May 14, 1982, was an erroneous exercise of jurisdiction, not action taken in want·of jurisdiction. *Buczkowski v. Buczkowski*, 351 Mich. 216, 88 N.W.2d 416 (1958).

The April 20, 1984, findings cite father's noncompliance with the eight goals. The trial court's finding of noncompliance clearly weighed heavily in the conclusion that J.M.G. was dependent as to her father. Because the goals were improperly imposed due to an exercise of erroneous jurisdiction, the trial court's reliance on noncompliance is unjustified.

3. The December 6, 1982, amended petition formed the basis of the lengthy hearing conducted in 1983 and 1984. Father alleges the evidence at trial was insufficient to support a dependency determination and the court erred in referring to matters alleged in the original dismissed petition. Dependency petitions must be proved by clear and convincing evidence. Minn.R.Juv.Ct. 59.05. The following findings of the trial court are relevant:

#### XIII.

That * * * the father, has failed to comply with the Court-ordered goals in that:

1. He has not contacted his local welfare authority in the State of Louisiana and arrange [sic] for a psychological evaluation, which has been reported to the Court.
2. That he has not signed the necessary authorization so that the reports may be referred to counsel and the courts by evaluators in Louisiana.
3. That he is not having an evaluation of his parenting ability performed by the Welfare authorities in Louisiana.
4. That he has submitted to this Court no report concerning the availability of foster care for [J.M.G.] in Louisiana.

#### XIV.

That [father] testified that he is gainfully employed in the State of Louisiana, but he has made no contribution for the cost of care for [J.M.G.]. His testimony at trial indicated that he is unwilling to contribute to those costs until his child was in his care.

#### XV.

That the father, * * * has seen Dr. Seymour Z. Gross, and Dr. Gross has recommended as follows:

A. Continued monitoring is necessary of the child by Child Protection or a Child Welfare Unit.
B. It is also indicated that for the benefit of the child and also for [father] to participate in a parenting program.
C. It would be recommended that [father] agree to follow-up mental health care which would most likely include a careful evaluation for medication to prevent decompensation.

#### XVI.

That [father] testified that he has no mental health problems, and that he, therefore, has no need for medication.

* * * * * *

#### XVIII.

That [father] presently resides by himself in the State of Louisiana and is employed to the extent that child care would be necessary for [J.M.G.].

Citing Minn.Stat. § 260.015, subd. 6(d), the trial court concluded that J.M.G. was a dependent child "without proper parental care because of the emotional, mental or

state of immaturity [sic] of her parent." The court also cited Minn.Stat. § 260.015, subd. 10(b), referring to neglected children, in its conclusions, although no adjudication of neglect was made.

██ In view of our conclusion that the May 14, 1982, goals were improperly imposed, a determination of dependency cannot be based in any way upon failure to comply with those goals. Of critical concern to us is a lack of findings as to father's present mental state, his present ability to parent J.M.G., or the other allegations stated in the December 6, 1982, petition. Such findings are essential. This dependency proceeding has been protracted and complex. The September 1981 removal of J.M.G. from her parents' custody permeates the April 1984 dependency decision. Yet, a review of the lengthy hearing record discloses that the original allegations made against father were largely refuted or never substantiated by credible evidence.

We conclude on the basis of the record before us that we cannot affirm the trial court. However, because of the special circumstances here present, we must fashion special relief. Father's rights and concerns, important as they are, are not the only rights and concerns present. J.M.G. is now over three years of age. What stability there has been in her life comes as a result of the care given her in foster homes. We must insure that reunion with her father is achieved in a manner which promotes and safeguards her best interests, and results in as little disruption to her stability as is possible.[3] We vacate the adjudication of dependency, and remand this matter to the trial court for further proceedings consistent with our decision below.

## DECISION

The trial court's adjudication of dependency of J.M.G. as to her father is vacated and this matter is remanded to the trial court for further proceedings and findings as to father's present mental state and

present ability to parent J.M.G. Upon remand, the trial court shall give no consideration to father's noncompliance with the goals established on May 14, 1982. The trial court shall take additional testimony regarding father's present mental state and present ability to parent J.M.G. The county attorney may amend the December 6, 1982, petition to address father's present mental condition and present ability to parent J.M.G. Upon remand, the court shall immediately institute all proper procedures to insure reunion of father and J.M.G. Pending resolution of the dependency proceeding, J.M.G. shall remain in the custody of the Hennepin County Health and Services Department.

Vacated in part and remanded.

CRIPPEN, J., concurring specially.

CRIPPEN, Judge (concurring specially).

I concur with the opinion of the court, but respectfully address an additional issue in the case.

There are, I believe, three primary juvenile justice issues, and each arises in this case.

First, juvenile court action, like other litigation, involves questions on dispositions employed. Major use of police powers occurred here. For questionable cause, a fourteen day old child was taken without notice, and public authorities refused to surrender physical custody of the child during the subsequent period of over three years. As is so often true in appeals from juvenile court, little could be done here to review or correct what has already been done.

Second, juvenile court action will be scrutinized to guarantee that its process is fundamentally fair. *See McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). When due process has been denied, remedies must be attempted to the extent they remain feasible. The majority opinion commendably addresses

---

**3.** We are not unmindful that mother has remarried and that, unfortunately, J.M.G.'s custody now may be at issue between mother and father.

the issue of process and the appellate remedies available in this case.

There is a third issue. The cornerstone of the juvenile court, especially in protection cases, is a promise, the legislated public purpose to help children:

> The purpose of the laws relating to juvenile courts is to secure for each child alleged or adjudicated neglected or dependent and under the jurisdiction of the court, the care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the child and the best interests of the state; to preserve and strengthen the child's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety cannot be adequately safeguarded without removal; and, when the child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents.

Minn.Stat. § 260.011, subd. 2 (1982).

Because of the public promise channeled into the juvenile court, it has been given immense authority and unparalleled freedom to act.

The extent of juvenile court authority is evident here. The severity of its actions is often greater, for example, than judicial determination whether children in a dissolution case should be placed with one parent or the other.

The freedom of the court is evident by viewing its closed doors, but this is only a part of the picture. Authority delegated to the court is exclusive, left entirely to specialized judges with infrequent rotation among members of the bench. The judges alone are fact finders, even when their judgment of facts is encumbered by knowledge of incompetent evidence or background information not found in the record. Because appeals from the court are uncommon, the juvenile court is often the agency of last resort for parties affected by its actions.

Here we have a case where the juvenile court's cornerstone is cracked. The prom-ise to help has been broken. The first three years of life for an infant have slipped by without minimal public efforts to see that she enjoys a stable living arrangement, with her parents or permanently without them.

Part of the broken promise in this case is due to inaction of the juvenile court. Allowing for caseload burdens and for the good will of the court, it remains troublesome to explain the occurrence of major police action followed by a delay of three years before a statement of court findings based on competent testimony. The lapse is still more inexplainable when it is found that the long-delayed findings are inadequate.

Other shortcomings in public effort are also evident. Prominent among them is the lack of contact with parents by social welfare agents in late 1981 and early 1982. Attempts were made to reach the parents by mail. There is no evidence of attempts to reach them through agents in Louisiana. There is little evidence of effective efforts to locate them through telephone contacts. At the same time, promised efforts were neglected to arrange for care of the child in Louisiana. The obligation for these efforts and others is owed to the child, and it is not excused when parents contribute to the problem.

What we see here has been evident before:

> There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.

*Kent v. United States*, 383 U.S. 541, 556, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966). The promise of care is honored best when severe police action is withheld. When harsh action occurs, care must come in herculean efforts to otherwise help the child.

How do we deal with a breach of promises built into the license of authority for

the juvenile court? Limiting the license for similar mischief in other cases is a legislative prerogative. However, we must underscore the lapse in child care evident in the record of the case, and I concur specially for that purpose.